CONCORD FINANCIAL GROUP, INC., Ronald J. Kramer, Jay R. Petschek, Peter M. Graham, James W. Sight, Joseph C. Grissom, Audrey Grissom, Kendrick T. Wallace and Jeffery L. Gibbs, Plaintiffs,

v.

TRI–STATE MOTOR TRANSIT CO. OF DELAWARE, Sue Billingsly, X.O. Bunch, Jr., Herbert V. Eskelin, Harold F. Nickels, H. Lang Rogers, C. Gerald Hendren, and Robert B. Thomson, Defendants.

Sue BILLINGSLY, et al., Counterclaim Plaintiffs,

v.

Ronald J. KRAMER, et al., Counterclaim Defendants,

v.

TRI–STATE MOTOR TRANSIT CO. OF DELAWARE, Nominal Counterclaim Defendant.

C.A. No. 10984.

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 25, 1989.
Decided: Sept. 6, 1989.

Steven J. Rothschild, Paul L. Regan, and Stuart M. Grant of Skadden, Arps, Slate, Meagher & Flom, Wilmington, and Sharon A. Coberly, and Stephen L. Hill, Jr. of Smith, Gill, Fisher & Butts, Kansas City, Mo., for plaintiffs.

Kenneth J. Nachbar, and Robert J. Valihura, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants and counterclaim plaintiffs.

## MEMORANDUM OPINION

HOLLAND, Justice: *

### Procedural Posture

Following the completion of discovery in this case, the parties have agreed to have their contentions decided based upon the paper record that they created. The parties have also submitted briefs and made oral arguments in support of their respective positions. This procedural posture is distinguishable from the submission of a case to the Court on cross-motions for summary judgment. *Empire of America v. Commercial Credit*, Del.Supr., 551 A.2d 433, 435 (1988). Although the parties are in substantial agreement about the events in this case, to the extent that it is necessary to do so, factual disputes must be resolved by the Court. Therefore, this opinion is the equivalent of a decision following a trial.

### Nature of the Proceeding

Tri–State Motor Transit Co. of Delaware ("Tri–State") is a Delaware corporation specializing in the transportation of various types of explosives and nuclear and radioactive materials. It is headquartered in Joplin, Missouri. In this lawsuit, filed on July 27, 1989,[1] the plaintiffs, all stockholders of Tri–State, seek review under 8 *Del.C.* § 225 of an election of directors, at the annual meeting of Tri–State's stockholders held July 18, 1989 (the "Annual Meeting").[2] The defendants in this action include Tri–State and its nominees for re-election to the Board of Directors

---

* Sitting by designation by an Order of the Chief Justice issued pursuant to Del. Const. art. IV, § 13(2).

1. Concurrently with the filing of that complaint, the plaintiffs filed a motion for a temporary restraining order seeking to prevent Tri–State's re-elected directors from engaging in "any extraordinary corporate transaction" or "taking any action to regulate, restrict or otherwise manipulate the corporate machinery of Tri–State" pending the outcome of this action. After a hearing on that motion, the parties entered into a stipulation and order which provides that Tri–State would give three business days' written notice to the plaintiffs before it would take certain corporate transactions.

2. According to Tri–State's certified Stockholder List, 1,214,308 shares of common stock were eligible to vote as of June 22, 1989, the record date for the Annual Meeting.

("Management" or the "Management Nominees").[3]

### Background To the Annual Meeting

Beginning in July, 1988, Corsair Partners ("Corsair")[4] and Concord Financial Group, Inc. ("Concord")[5] began to acquire Tri-State's common stock.[6] In a letter dated July 15, 1988, Corsair sought a meeting with representatives of Tri-State to discuss methods of maximizing shareholder value. Representatives of Tri-State met with representatives of Corsair and Concord on three separate occasions in July and August, 1988. During these meetings, Corsair and Concord initially suggested that stockholder value be maximized through a restructuring of Tri-State or through a going-private transaction. Corsair and Concord subsequently offered to acquire all of Tri-State's common stock at $17.50 per share. On September 7, 1988, the Tri-State board rejected the Corsair/Concord offer as inadequate and not reflecting the value of the company.

During the same time period that Tri-State was meeting with Corsair and Concord, it was also meeting with individuals who eventually became representatives of a company known as TRISM. On August 24, 1988, TRISM offered to acquire all of the outstanding shares of common stock of Tri-State at $18.50 per share. That offer was subsequently increased to $20 per share. On September 15, 1988, the Tri-State board of directors authorized Management to enter into an agreement in principle with TRISM.

On October 7, 1988, the Tri-State board of directors approved an agreement of merger with TRISM, which was contingent upon TRISM obtaining financing. On February 18, 1989, a proxy statement was sent by Tri-State to its shareholders soliciting proxies in favor of the approval of the merger. At a special meeting of Tri-State stockholders held on March 14, 1989, the shareholders voted in favor of the merger with TRISM.

As of March 14, 1989, TRISM was unable to obtain financing to consummate the merger. At TRISM's request, Tri-State extended the effective date of the merger agreement from March 15, 1989 to June 1, 1989. By June 1, 1989, TRISM had still not obtained the necessary financing for the transaction. By their terms, all agreements between Tri-State and TRISM automatically terminated when the merger agreement was not consummated by June 1, 1989.[7]

### Committee's Decision to Challenge Incumbent Directors

Representatives of Corsair and Concord formed the Committee to Maximize Stockholder Value (the "Committee"). On June 5, 1989, Tri-State received a request to place in nomination for election as directors

---

3. Tri-State management nominated Sue Billingsly, X.O. Bunch, Jr., Herbert V. Eskelin, Harold F. Nickels, H. Lang Rogers, C. Gerald Hendren and Robert G. Thomson for re-election to Tri-State's Board of Directors.

4. According to the Schedule 13D filed with the Securities and Exchange Commission ("SEC"), Corsair is a New York general partnership with three general partners: Nall Avenue Partnership ("Nall"), GKP Partners ("GKP"), and plaintiff and counterclaim defendants, Joseph C. Grissom and Audrey Grissom. The general partners of GKP are plaintiffs and counterclaim defendants Graham, Kramer and Petschek. Plaintiff and counterclaim defendant Sight is a general partner of Nall.

5. As described in the Schedule 13D, Concord is a Kansas corporation with its principal business as the acquisition of securities and Pioneer Sav-

ings & Loan Association ("Pioneer"), a Kansas savings and loan, owns all of the stock of Concord. The Schedule 13D also discloses that Ralph E. Lewis, II is President of Pioneer as well as a general partner of Nall.

6. According to the Schedule 13D, Corsair and Concord had acquired 49,000 shares and 73,100 shares, respectively, as of August 4, 1988.

7. Discussions with potential purchasers of Tri-State, including TRISM, continued. On August 18, 1989, Tri-State announced that its board had approved in principle a transaction pursuant to which TRISM would acquire Tri-State, with stockholders being given an election of receiving $21.25 per share in cash, $22.50 per share in seven-year notes bearing interest at 14⅞%, or two different combinations of cash and notes. No higher bid has been made by any other party, and no bid above $17.50 per share has ever been made by Concord/Corsair.

**4**

at the Annual Meeting the names of seven individuals who were affiliated with Corsair and Concord. The nominating committee of the Tri–State board declined to nominate any of those individuals. On June 6, 1989, the Committee publicly announced that, in opposition to the Management Nominees, it had nominated Joseph C. Grissom, James W. Sight, Peter M. Graham, Ronald J. Kramer, Jay R. Petschek, Kendrick T. Wallace and Joseph L. Hiersteiner (the "Committee's Nominees") for election to the Board of Directors of Tri–State at the Annual Meeting. On June 20, 1989 and June 26, 1989, Corsair, Concord and their affiliates filed Schedule 14B statements with the Securities and Exchange Commission ("SEC"), indicating their intention to solicit proxies from the holders of Tri–State's common stock.

### The Proxy Solicitors

Tri–State hired Corporate Investor Communications, Inc. ("CIC"), to handle its solicitation efforts. CIC had acted as Tri–State's regular proxy solicitor for approximately the last ten years. On June 23, 1989, Tri–State mailed to its stockholders a notice of an annual meeting and proxy statement along with Tri–State's annual report. The Tri–State proxy statement sought shareholders' proxies for the election of Management's Nominees at the Annual Meeting.

On June 19, 1989, the Committee hired Kissel–Blake, Inc. ("Kissel–Blake"), to solicit proxies from Tri–State stockholders in support of the Committee's Nominees. Kissel–Blake assisted the Committee in the preparation of its proxy cards and proxy statement. Kissel–Blake hired Tyrell Printing ("Tyrell") to do the Committee's printing. Tyrell printed the return envelopes, which accompanied the Committee's proxies, on June 28 or 29, 1989, and printed the Committee's proxy cards and proxy statement on June 30, 1989. Kissel–Blake mailed the Committee's first set of proxy materials to Tri–State stockholders on July 1, 1989. Kissel–Blake also mailed a second set of proxy materials to stockholders on July 8, 1989.

Tri–State's proxy solicitor, CIC, used green proxy cards to solicit votes for the Annual Meeting. Those cards appointed "Herbert V. Eskelin, Harold F. Nickels and C. Gerald Hendren, jointly and individually, as Proxies" ("the "Management's Proxy Representatives") and authorized them "to represent and to vote" the stockholders' shares "as designated" on the card. The proxy card provided that in the absence of specific direction, the shares "will be voted for all nominees for Directors listed [on the card]." The Tri–State proxy card also stated that the stockholder "hereby revokes any Proxy heretofore given." The Management Nominees listed on the green card are the counterclaim plaintiffs herein.

The Committee's proxy solicitor, Kissel–Blake, used white cards to solicit proxies on behalf of the Committee. The Committee's proxy cards state that the "undersigned hereby appoints James W. Sight and Ronald Kramer (the "Committee's Proxy Representatives") ... as proxies ... to vote all Shares of [the undersigned stockholder's Tri–State Common Stock] ... on the following matters as designated on the reverse side." The Committee proxy card also states "THIS PROXY REVOKES ALL PRIOR PROXIES" and "UNLESS OTHERWISE SPECIFIED, THIS PROXY WILL BE VOTED FOR THE ELECTION OF DIRECTORS OF THE NOMINEES." The Committee Nominees listed on the white card are the counterclaim defendants herein.

### The Inspector of the Election

Since the election of directors was being contested by the Committee, Tri–State decided to obtain the services of an independent entity to act as the inspector of the election. Early in July 1989, Robert Thomson ("Thomson"), Tri–State's general counsel, contacted Corporation Trust ("CT") about the possibility of serving as the inspector of the election. On July 10, 1989, CT sent Thomson an engagement letter and attached to it a list of procedures that CT would follow in running the election, absent an agreement between Management and the Committee. Tri–State decided not

to engage CT because, among other things, CT intended to count in its tabulation, and treat as valid under Delaware law, telegraphic proxies.

However, in a lawsuit originally brought by Tri–State in the United States District Court for the Western District of Missouri against the Committee, asserting violations of the federal securities laws, the Committee filed a motion to have CT appointed to serve as the inspector of the election of directors at the Annual Meeting. On July 14, 1989, that Court appointed CT as a master to conduct and certify the election of directors at the Annual Meeting,[8] i.e., to serve as the inspector of the election (the "Inspector").

### Tabulating the Proxies

On July 18, 1989, shortly after 10:00 a.m. C.S.T., the time set for the Annual Meeting, the appointees of the Committee's Proxy Representatives and Management's Proxy Representatives each executed master ballots. Each master ballot was presented to the Inspector along with the proxies which had been solicited by Kissel–Blake (on behalf of the Committee) and CIC (on behalf of Tri–State). Following the voting, the Inspector closed the polls, and the meeting was adjourned.

On July 19, 1989, the day following the Annual Meeting, the Inspector simultaneously provided to both Tri–State and the Committee a preliminary tabulation of election results. The preliminary vote count indicated that Management's Nominees had received the highest totals for the vote on the election of directors of Tri–State. Thereafter, the Inspector conducted an all-day proxy review session of the proxies which had been voted at the Annual Meeting. At the review session, representatives of both the Committee and Management had an opportunity to challenge the man-

ner in which the proxies had been tabulated by the Inspector.[9]

Following the challenge session, the Inspector certificated the following results of the votes cast in person or by proxy by stockholders of Tri–State who were eligible to vote:

| | |
|---|---|
| Herbert v. Eskelin | 494,339 |
| H. Lang Rogers | 494,339 |
| Harold F. Nickels | 494,165 |
| Sue Billingsly | 494,139 |
| C. Gerald Hendren | 494,139 |
| Robert G. Thomson | 493,739 |
| X.O. Bunch, Jr. | 492,858 |
| Joseph C. Grissom | 492,438 |
| James W. Sight | 492,438 |
| Peter W. Graham | 492,438 |
| Jay R. Petschek | 492,438 |
| Kendrick T. Wallace | 492,438 |
| Joseph L. Hiersteiner | 492,438 |
| Ronald J. Kramer | 492,438 |

Thus, according to the Inspector's Amended Certificate,[10] Management's Nominees, Billingsly, Bunch, Eskelin, Nickels, Rogers, Hendren and Thomson were re-elected as Tri–State's directors by between 420 and 1,901 votes.

### Governing Legal Principles

■ Fundamental principles of corporate governance must be balanced and reconciled in any action brought to review an election of directors under Section 225. The stockholders' "franchise is the ideological underpinning upon which the legitimacy of directorial power rests." *Blasius Indus. v. Atlas Corp.*, Del.Ch., 564 A.2d 651, 659 (1988). Therefore, Delaware courts have vigilantly guarded against stockholder disenfranchisement in contested corporate elections. *See Williams v. Sterling Oil of Okla.*, Del.Supr., 273 A.2d 264, 265 (1971); *Standard Power & Light Corp. v. Investment Associates, Inc.*, Del.

---

8. That federal lawsuit was subsequently dismissed. Therefore, this litigation is the only legal action pending at the present time.

9. The only challenges asserted in this litigation which the Committee made at the challenge session were to the proxies for shares of the Blake P. Garrett, Sr. Foundation and the Cecilia

Mary Clever Trust. Both challenges were rejected after due consideration by the Inspector.

10. The Inspector inadvertently failed to include Mr. Kramer's name and vote tally in the original certificate.

Supr., 51 A.2d 572, 580 (1947). However, the policy against stockholder disenfranchisement is counterbalanced, in appropriate circumstances, by the need for finality in corporate elections, in order to avoid a prolongation of internal strife. *See Williams*, 273 A.2d at 265.

■ The necessity for an expeditious conclusion of corporate elections that is consistent with the stockholders' franchise has resulted in the development of practical and certain rules. *Id.* The rule which is relevant for present purposes is to insure the fair handling of proxies. It is administered in the first instance by the inspectors of corporate elections, whose functions and powers are purely ministerial and non-quasi judicial. *Id.* The rule requires the inspectors "to reject all identical but conflicting proxies when the conflict cannot be resolved from the face of the proxies themselves or from the regular books and records of the corporation. Otherwise stated, conflicting proxies, irreconcilable on their faces or from the books and records of the corporation, may not be reconciled by extrinsic evidence." *Id.* This rule satisfies the corporate need for finality in elections by simply requiring that stockholders exercise their right to vote by proxy with a reasonable degree of care.

### THE PLAINTIFF'S CONTENTIONS

"Although the report of the inspectors of election is ministerial, it is presumed to be correct." *Berlin v. Emerald Partners*, Del.Supr., 552 A.2d 482, 491 (1988). However, the Court may examine the actual facts to correct errors of law. *Id.* In this litigation, the Committee submits that the Inspector made four legal errors in counting the proxy votes and thereby "disenfranchised stockholders whose desire to vote for the Committee was clearly and validly expressed." The Committee argues that the alleged legal errors must be corrected and that this Court can do so without any negative impact on the policy of finality of corporate elections. Each of the Committee's legal contentions will be examined separately.

### The Clever Proxy

■ Cecilia and Henry Clever (the "Clevers"), as trustees of a trust for the benefit of Cecilia Clever (the "Clever Trust"), were entitled to vote 800 shares of stock at the Annual Meeting. The Clevers initially executed a proxy for 800 shares in favor of Management *dated July 10, 1989*, and mailed it in an envelope *postmarked July 11, 1989*. The Clevers also executed a proxy for 800 shares in favor of the Committee *dated July 10, 1989* and mailed it in an envelope *postmarked July 12, 1989*.

At the Annual Meeting, Kissel–Blake presented the Inspector with the Committee proxy card seeking to vote the 800 shares of the Clever Trust in favor of the Committee's Nominees. CIC presented the Inspector with the Tri–State proxy card seeking to vote the Clever Trust shares in favor of Management's Nominees. Thus, as it counted the proxies submitted with each master ballot, the Inspector was confronted with a Management proxy card signed in the name of the Clever Trust and *dated July 10, 1989* and a Committee proxy card also signed in the name of the Clever Trust and also *dated July 10, 1989*.

Since the conflicting proxies were dated, the Inspector, as is its long-standing practice, did not look to the postmarks on the envelopes to seek to discern which was the later-dated proxy. As a result of this conflict on the face of the proxy cards, the Inspector determined that there was a "stand off" of the Clever Trust shares. Therefore, the Inspector did not recognize the Clever Trust shares as voting for either the nominees of Management or the Committee. The Inspector did count the Clever Trust shares present for quorum purposes.

The Committee challenges the Inspector's decision. The Committee asserts that since the envelope in which the Committee proxy was received bears a postmark date of July 12, 1989, while the envelope in which the Management proxy was received bears a postmark date of July 11, 1989, the Committee's Nominees should receive the vote of 800 shares held by the Clever Trust. The Committee argues that the later postmark on the envelope containing

the proxy for the Committee plainly evidenced the Clevers intent to revoke the earlier Management proxy and to vote for the Committee.

During the depositions, when asked about its policy regarding the use of postmarks to determine the latest dated proxy, the Inspector stated that it had examined the Clever Trust shares using the presumptions that it has followed in previous elections in which it has served as Inspector.[11] The Inspector explained that if there are two undated proxies from the same stockholder, the postmark *is* reviewed to determine the later dated proxy. However, if there are two proxies with the same execution date, the postmark is not reviewed to determine the later proxy, because where proxies on their face bear the same date, postmarks are not conclusive evidence of which proxy was executed last. Since the postmark evidence would not resolve which

proxy was later, the Inspector concluded that the proxies represented an inconsistent assignment to the proxy appointees.

The presumptions applied by the Inspector [12] are not consistent with Delaware law. The "postmark" issue which was presented to the Inspector has been addressed and resolved by this Court:

The question posed should perhaps be tested first by the analysis of a broader question, namely, where there are conflicting proxies, should the postmark be considered at all in attempting to determine which proxy was executed later?

. . .

Clearly, if the emphasis is to be placed on the fact that we are seeking the last clearly expressed intent of the stockholder and the postmark time does not necessarily reflect such intent, then the postmark time should be ignored, and the

---

11. Inspector Marsh testified:

[By Mr. Grant]

Q. What did the inspectors of election do?

A. The management card signed in the name of the trust is dated July 10th. The opposition card also signed in the name of the trust is similarly dated July 10th. That represents an inconsistent assignment of proxy committees since they're dated the same. There's no revocation. That's what we call a standoff where the shares are not assigned to either proxy committee, but since the proxies are validly signed they're counted for quorum purposes as being present at the meeting.

Q. Did the inspectors of election after seeing a standoff between the execution date then go to the postmark date to see which was the later proxy?

A. No, we didn't.

Q. In other instances CT will use the postmark as the date. Is that correct?

A. Not in similar instances to this, no. CT will only go to postmarks when there are undated cards and you need to go beyond the face of the card to the envelope to determine the date of execution.

Q. Let me see if I understand you. If you've got two proxies, one for each side, and they're not dated, you then go to the postmark. Is that correct?

A. That would be correct in that instance, yes.

Q. If you have two proxies that are both dated the same day, then you don't go to the postmark' you just call it a standoff? Is that correct?

A. That's correct.

Q. That's what was done here?

A. Yes, sir.

As Inspector Marsh further testified with respect to similarly dated, but inconsistently assigned, proxy cards:

[By Mr. Nachbar]

Q. For how long has it been CT's practice not to take the postmark into account when the last dated proxies are dated the same?

A. To my knowledge, it's always been CT's practice to do that. There have been cases, however, when there is an agreement between the parties with a set of presumptions where we have been instructed to go beyond the face of the card and to consider postmark dates to resolve standoffs.

Q. But there was no such instruction or agreement with the parties in this case, was there?

A. There was not, no.

12. An identical procedure is apparently used by the Independent Election Corporation of America ("IECA"). IECA contracts with banks and brokerage houses to disseminate proxy material directly to the beneficial stockholders of the stock. In addition, in a contested election situation, IECA tabulates the proxies on behalf of the beneficial stockholders and then executes a "contest voting form" which indicates the total beneficial stockholders proxy votes for each of IECA's clients. In tabulating that vote, IECA itself acts as an inspector of elections applying certain presumptions. An IECA's representative testified in this case that IECA's voting procedures in a contested proxy solicitation is to treat same-dated proxies as standoffs, regardless of the postmarks of their mailing envelopes. IECA thus follows the same presumptions used by the Inspector here.

inspectors acted properly when they refused to count such proxies. However, if the emphasis is to be placed on enfranchisement, as opposed to disenfranchisement, plus the probable realities of the situation in most cases, then the time of the postmark should be accepted as sufficient evidence of the later expression of intent by the stockholder.

The benefits which inure from a recognition by inspectors of election of the postmark time as acceptable and controlling evidence of the later expression of intent by a stockholder are sufficient to recommend the rule to me. There can be no uncertainty in its application and for the most part I feel that it will reflect what the inspectors are seeking to ascertain, namely, which proxy was executed later? Proxy forms are generally mailed by opposing groups to the same address so that if they are received on the same day, they will in all probability be mailed from the same place. It hardly need be said that if a stockholder mails a proxy to one group after he has mailed one to the opposing group, the later mailing must be taken to show his intention in the matter. I conclude that the inspectors of election improperly refused to recognize the postmark time as determinative evidence of the stockholder's expression of intent.

*Investment Associates v. Standard Power & Light Corp.*, Del.Ch., 48 A.2d 501, 513 (1946), *aff'd*, Del.Supr., 51 A.2d 572 (1947). Management argues that the rationale of *Investment Associates* was overruled by *Williams*. Management argues that when the execution dates are the same, Delaware law now requires that the Inspector "reject all identical but conflicting proxies when the conflict cannot be resolved from the face of the proxies themselves or from the regular books and records of the corporation." *Williams*, 273 A.2d at 265. Although Management's statement of the law is correct, Management's conclusion that *Investment Associates* and *Williams* are

inconsistent is not supported by a reading of those cases.

The Court of Chancery's decision in *Investment Associates* was appealed to the Delaware Supreme Court and affirmed. In affirming that decision, the Delaware Supreme Court noted that the "opposition *proxy bears* an execution date and *a postmark date*, both of which are subsequent to the execution and *postmark dates on the* management *proxy.*" *Investment Associates*, 51 A.2d at 580 (emphasis added). This statement reflects an apparent finding by the Delaware Supreme Court that a postmark on an envelope is an integral part of a proxy, when that envelope is submitted to the inspector of elections with the proxy. After reaching that conclusion, the Supreme Court held that the "subsequent execution date and *postmark date* are sufficient evidence to warrant a finding that the opposition proxy was given subsequent to the management proxy." *Id.*

When the Supreme Court subsequently announced the rule of *Williams*, it cited the *Investment Associates* case with approval, albeit for a different proposition. Management suggests that although *Investment Associates* was cited with approval for one proposition, it was then implicitly overruled by the Delaware Supreme Court in the next paragraph. The more logical conclusion is that the Delaware Supreme Court was aware of its finding in *Investment Associates*, i.e., that the postmark on an envelope which is submitted with a proxy is a part of that proxy. Therefore, it follows that the Supreme Court intended to include the proxy *and its envelope* within the phrase "face of the proxies themselves" when the rule in *Williams* was announced.[13]

In this case, the Inspector erred as a matter of law in not looking at the postmark on the envelopes of the Clever proxies. The Inspector should have looked to the postmarks on the envelopes and, based upon the July 12 postmark, counted the 800

**13.** This reading makes the two Delaware Supreme Court decisions consistent. If the Delaware Supreme Court intended to overrule its

decision in *Investment Associates,* it would have done so expressly in *Williams.*

Clever Trust shares as voting in favor of the Committee.[14]

### The Garrett Proxy

■ The Blake P. Garrett Sr. Foundation (the "Foundation") holds 3,050 shares of Tri–State Common Stock that were voted at the Annual Meeting. In fact, at the Annual Meeting, the Inspector was presented with a proxy by the Committee and a proxy by Management each purportedly authorizing the vote of all of the 3,050 shares owned by the Foundation. The proxy card delivered to the Inspector by Management's Proxy Representatives was a green Tri–State proxy card dated June 26, 1989 and signed by J. Berry Garrett, Trustee for the Foundation. The other proxy card presented to the Inspector, with respect to the shares owned by the Foundation, was also a green card, but was submitted by the Committee's Proxy Representatives.

The green proxy card submitted by the Committee was undated and was signed by Blake P. Garrett, Sr. That proxy card had been modified in several respects. First, written on it were the words "White Card," the initials "BPG," and the names Grissom, Sight, Graham, Kramer, Petschek, Wallace and Hiersteiner. Second, the names Sue Billingsly, X.O. Bunch, Jr., Herbert V. Eskelin, Harold F. Nickels, H. Lang Rogers, C. Gerald Hendren and Robert B. Thomson had been crossed out. Finally, the words "directors listed in proposal 1 and for proposal 2" were crossed out and the words "Committee to Maximize Stockholder Value" were written underneath the crossed out words.

During the proxy count, in an effort to determine when the undated modified green Tri–State proxy card may have been executed, the Inspector reviewed the envelope in which that card had been sent. There was no postmark or other evidence of when the undated proxy card was executed on its envelope. Therefore, the Inspector recognized as valid the dated Foundation Tri–State proxy card and did not tabulate the votes cast pursuant to the undated green Tri–State proxy card, in favor of the Committee's Nominees.

The Committee challenged the Inspector's decision. In rejecting the Committee's challenge, the Inspector followed its usual rule that an undated proxy card is revoked by a properly executed and dated proxy card, when there is no evidence of a date on the envelope for the undated proxy.[15] The Committee argues that the Inspector erred by not looking beyond the envelope to Tri–State's books and records to determine that the undated Garrett Foundation proxy in favor of the Committee was later in time than, and thus revoked, the earlier June 26 Garrett Foundation proxy, executed in favor of the Management Nominees. The Committee argues that, as a consequence of this error, the Inspector erroneously counted all of the Foundation's 3,050 shares in favor of Management, when it should have counted these shares for the Committee's Nominees, representing an improper net shifting of 6,100 votes in Management's favor.

The deposition testimony in this case explains the origin of the conflicting Garrett proxy cards. On June 26, 1989, the Foun-

---

**14.** In E. Aranow and H. Einhorn, *Proxy Contests for Corporate Control*, 420 n. 79 (2d ed. 1968), the authors write:

> It is possible that reliance on the postmark time can dictate the acceptance of a proxy actually mailed prior to its duplicate. For example, assume that a stockholder resides in the suburbs. On his way to work in the morning, he deposits a proxy to the management in his rural mail box. Shortly after he arrives at his office in the city, he changes his mind and mails a proxy to the insurgent group. The faster pickup service and canceling operation of the city post office could result in this proxy bearing an earlier post-

mark time than the proxy placed in the rural mailbox. Thus the latter proxy will be deemed a revocation of the proxy given to the insurgents, contrary to the intent of the stockholder.

Nevertheless, this jurisdiction, like the authors, has concluded that "where both proxies have the same date of execution, but different postmark dates, the one with the latter postmark prevails." *Id.* at 421.

**15.** The Committee urged the appointment of CT as the Inspector and it is fair to assume that the Committee was familiar with CT's customary practices and presumptions.

dation, by J. Berry Garrett, Trustee, executed a green proxy card, received from Tri–State, evidencing its desire to vote all of the Foundation's 3,050 shares for the Management Nominees. After voting for Management's Nominees, the Foundation received proxy materials from the Committee. Following receipt of the Committee's proxy materials in early July, J. Berry Garrett and Blake Garrett, Sr. apparently discussed for whom the Foundation should vote. Blake Garrett, Sr. testified that he and his son, J. Berry Garrett, agreed that the Foundation should vote for the Committee.[16] J. Berry Garrett then went on vacation without executing a proxy card in favor of the Committee's Nominees.

During his son's absence, Blake Garrett, Sr. decided to send in a Foundation proxy card directing that its shares be voted in favor of the Committee's Nominees. However, he could not find the Committee's white proxy card. Therefore, Blake Garrett, Sr. crossed out the printed names of Management Nominees on a green proxy card that had been received from Tri–State and wrote in the names of each of the Committee's Nominees and the words "White Card"—the color of the Committee's proxy cards—beside his initials ("BPG").[17]

Blake Garrett, Sr. testified that he took the green proxy card that he had modified to express the Foundation's intention to have its shares voted for the Committee and placed it in a Kissel–Blake envelope. Blake Garrett, Sr. testified that he also inserted a white proxy card that he had executed in favor of the Committee with respect to 750 Tri–State shares held by Garrett & Garrett (a partnership that also owns Tri–State stock) into the same envelope. He had dated this "other proxy" card July 5, 1989.

Blake Garrett, Sr. mailed the envelope and its contents to Kissel–Blake. When Kissel–Blake received the envelope containing the two proxies sent by Blake Garrett—the modified green proxy card on behalf of the Foundation and the white proxy card on behalf of Garrett & Garrett—it "Bates" stamped both proxies and the envelope in which they arrived with the number 00245. The number 00245 was chronological and was placed on the Garrett proxies, as was Kissel–Blake's usual custom, on the day that the proxies arrived at Kissel–Blake.

The Committee submits that the Inspector erred in not resolving the dispute about the execution of the undated Foundation proxy by examining the books and records of Tri–State, and submits that the Inspector was required to do so according to *Williams*. The Committee argues that the fact that the undated Foundation proxy was executed and mailed after the earlier June 26 proxy for Management (and thus revoked the June 26 proxy) is evident from records that were available to the Inspector, and from circumstances known to the Inspector, at the Annual Meeting. The Committee submits that the books and records of Tri–State reflect that before June 30, 1989, the Garretts could not have received the Committee's proxy materials; that they did not know, nor could they have known, who the Committee's Nominees were[18]; or that the Committee's form of

16. Management argues that the record more accurately reflects that the Garretts agreed to confer further after J. Berry Garrett returned from vacation. This position is supported by some testimony and the the fact that Blake Garrett, Sr. was not a trustee of the Foundation. In fact, when J. Berry Garrett returned from vacation, he executed certain papers to ratify his father's action in signing the proxy card. However, the Court's disposition of the Foundation proxy card controversy makes it unnecessary to address Blake Garrett, Sr.'s authority to execute a proxy for the Foundation.

17. As has already been noted in this opinion, Blake Garrett, Sr. also crossed out the printed

material which stated that, in the absence of any directions from the person signing the card, the proxy would be voted for all nominees for "directors listed in proposal 1 and proposal 2" (i.e., the Management Nominees), and in its place wrote the words "Committee to Maximize Stockholder Value." As a result, this revised sentence on the second green proxy card read as follows: "If no direction is given, this proxy will be voted for all nominees for 'Committee to Maximize Stockholder Value.' "

18. In response to this statement, Tri–State points out that the Committee's Nominees had been disclosed for some time in the Committee's

proxy card was printed on white paper.[19] The Committee also argues that Blake Garrett could not have obtained a Kissel–Blake envelope prior to June 30, 1989.

The Court finds it unnecessary to determine whether, as a matter of law, the Inspector should have looked beyond the Foundation's proxy cards and envelopes and also finds it unnecessary to determine what conclusion could have been drawn from Tri–State's books and records, if the Inspector had examined them. The record reflects that the *undated* Foundation proxy was *not properly voted* at the Annual Meeting.

The undated Foundation proxy card, as modified by Blake Garrett, Sr., on its face "hereby appoints Herbert V. Eskelin, Harold F. Nickels and C. Gerald Hendren, jointly and individually, as Proxies . . . and hereby authorizes them to represent and to vote as designated below. . . ." However, the undated Garrett Proxy was never delivered to Messrs. Eskelin, Nickels or Hendren. Instead, Blake Garrett, Sr. mailed the proxy to Kissel–Blake, the proxy solicitor for the Committee. When the Foundation sent its proxy card to the Committee, appointing the Management's Proxy Representatives to act on its behalf at the Annual Meeting, it did not thereby empower the Committee's Proxy Representatives to vote its shares.

The Delaware law provides that all "elections of directors shall be by written ballot." 8 *Del. C.* § 211(e). The Delaware law also provides that "each stockholder entitled to vote at a meeting of stockholders . . . may authorize another person or persons to act for him by proxy." 8 *Del. C.* § 212(b). It is undisputed that Management's Proxy Representatives, Messrs.

Eskelin, Nickels and Hendren—whom the undated Garrett Proxy on its face appointed to vote—never attempted to vote that proxy. Therefore, even if Tri–State's books and records did reveal that the undated proxy was executed last in time, no person appointed by the undated Foundation proxy voted that proxy in the election for directors at the Annual Meeting.

During the oral argument in this case, the Committee argued that Management's Proxy Representatives breached their fiduciary duty by not voting the Foundation's shares, as they were directed to in the undated proxy. Management responded to that charge by pointing out that Messrs. Eskelin, Nickels, Hendren had no knowledge of the proxy directing them to vote in favor of the Committee until the polls were closed and the review session was in progress. The Committee's reply was that Management's Proxy Representatives could and should have somehow found out about the undated Foundation proxy, which was in the possession of the Committee's proxy solicitor, before the polls were closed. The Court is not persuaded by the Committee's argument.

The votes of the Committee and Management were each cast simultaneously by separate master ballots which were delivered to the Inspector along with all of the proxy cards. Kissel–Blake knew that it had an undated Foundation proxy card directing Management's Proxy Representatives to vote for the Committee's slate of directors. Instead of delivering that proxy card with the Committee's master ballot, Kissel–Blake should have given the undated Foundation proxy card to Messrs. Eskelin, Nickels and Hendren prior to the clos-

filings with the Securities and Exchange Commission.

**19.** The Committee also states that Tri–State's books and records included; among other things: 1) a complaint in a federal lawsuit by Tri–State against certain of the plaintiffs in this lawsuit in which Tri–State asserted that the Committee's proxy materials were circulated to stockholders "[o]n or about June 30, 1989,"; 2) a letter dated June 26, 1986 sent by overnight mail from defendant Thomson to Kissel–Blake in which Thomson, following an Order from the Court of Chancery in an earlier § 220 action, finally produced a list of Tri–State's stockholders to the Committee; 3) the Committee's proxy material which stated on its cover, "This Proxy Statement and the accompanying Proxy card are first being sent to the Company's stockholders on or about June 30, 1989."; and 4) Management's letter to the SEC, dated June 28, 1989, referring to "an anticipated proxy contest with regard to the election of directors. . . ."

ing of the polls and demanded that they vote for the Committee's Nominees.

After the Inspector had closed the polls, counted the votes, and announced the preliminary results of the election, it was then too late to open the polls and receive the votes of any stockholder who had not voted.[20] *Atterbury v. Consolidated Coppermines Corp.*, Del.Ch., 20 A.2d 743, 748 (1941). The polls were closed when the contents of the undated Foundation proxy were disclosed to Messrs. Eskelin, Nickels and Hendren. The Inspector had no authority to open the polls to permit them to vote in favor of the Committee, even if the Foundation's undated proxy was properly executed subsequent to the Tri–State proxy card. *Id.*

The Committee argues that the Foundation was disenfranchised by the Inspector and Management who did not effectuate its intentions. However, the situation which is now before the Court was set into motion by the Foundation when it returned two proxy cards which were in direct conflict, did not date one of them, and did not send the undated card to the Management Proxy Representatives named on that card. The Foundation's actions were compounded when the recipient of its undated proxy card—the Committee's proxy solicitor—did nothing to communicate the Foundation's desires to the representatives who had been designated in the undated proxy.

The events which had been set into motion by the Foundation's conduct could not be cured by the Inspector after the polls were closed, even if the books and records would support its position. The Foundation must bear the responsibility for its conduct, which resulted in having the Inspector recognize its dated proxy. *See Enstar Corp. v. Senouf,* Del.Supr., 535 A.2d 1351, 1355 (1987); *American Hardware Corp. v. Savage Arms Corp.,* Del. Supr., 136 A.2d 690, 692 (1957). The Inspector properly counted the dated Tri–

State proxy and rejected the Foundation's undated proxy card.

### *One–Side Telecopied Proxies*

■ Harold Gailor ("Gailor"), A. John Macchi ("Macchi"), Douglas Packer ("Packer"), and Michael Pexton ("Pexton") are record holders, in the aggregate, of 294 shares of Tri–State stock and all were eligible to vote their stock at the Annual Meeting.[21] Gailor, Macchi, Packer and Pexton each executed a proxy in favor of the Committee's Nominees.

Kissel–Blake received the fully executed Committee proxy cards from Gailor, Macchi, Packer and Pexton by mail in its New York office. Kissel–Blake telecopied the proxies to its representatives in Joplin early in the morning on July 18 in order to have these proxies voted that day. However, only one side of each of the proxy cards was telecopied to Joplin.

At the Annual Meeting, the Inspector was presented by Kissel–Blake with four facsimiles purportedly representing proxies for the shares of Gailor, Macchi, Packer and Pexton. The facsimiles received by the Inspector included only one side of each proxy card. The side of the proxy card that had been telecopied contained all of the information essential to ascertaining the manner in which these stockholders had decided to vote their shares, i.e., the name of each record holder, the number of shares held, the instructions to vote for the Committee's Nominees, the signature of the record holder and the date on which the proxies were executed. However, the telecopied side of the proxy cards did not appoint anyone to vote the shares. The Inspector ruled that, in the absence of an appointment of someone to vote the shares, the four telecopied proxies could not be counted.

The Committee submits that Messrs. Gailor, Macchi, Packer and Pexton, were im-

---

**20.** During oral argument, the Committee appeared to argue that the polls could be reopened during the challenge session, prior to the certification of the election results by the Inspector. That position does not appear to be consistent with the principles recognized in *Atterbury.*

**21.** Gailor, Macchi, Packer and Pexton hold, respectively, 9, 252, 18 and 15 shares of Tri–State stock.

properly denied their right to vote at the Annual Meeting. The Committee argues that the Inspector ignored the obvious fact that the four stockholders intended to vote for the Committee and the failure to telecopy the other side of the proxy card was a clerical error. The Committee also argues that had the Inspector asked for "the back-up" to the four one-sided telecopied proxy cards, Kissel–Blake could have provided that backup.

The Court accepts the Committee's proposition that the failure to telecopy both sides of each proxy card was a clerical error. The Delaware Supreme Court has squarely addressed the Inspector's authority to correct such errors:

> We agree, of course, that the correction of clerical mistake should be favored over disenfranchisement; but not at the price of uncertainty of procedure, impractical delay in election results, or possible invitation to fraud. The policy favoring correction of mistake must be *limited to corrections that can be made from the face of the proxy itself or from the regular books and records of the corporation.*

*Williams,* 273 A.2d at 265 (emphasis added).

In this case, the correction of the clerical mistake could not be made from the face of the proxy itself or the books and records of the corporation. If the Inspector had accepted "back up" evidence, it would have violated the dictates of *Williams.* The Committee argues alternatively that if the acceptance of "back up" evidence is prohibited, that the contents of the reverse side of its form of proxy card was obvious. However, in this very case, the Foundation modified the contents of a printed proxy card.

Kissel–Blake is a professional proxy solicitor. When only one side of the proxy card was telecopied to Joplin, Kissel–Blake should have telephoned its office in New York and asked for the other side.[22] Kis-

sel–Blake should have submitted both sides of the telecopied proxy card before the polls were closed. The Inspector had no authority to accept additional evidence after the polls were closed. *Atterbury,* 20 A.2d at 748; *Williams,* 273 A.2d at 265.

The Court has already stated that, in order to be voted, Delaware law requires a proxy to contain language which appoints someone to act on behalf of the stockholder. 8 *Del.C.* § 212(b). Without a facsimile of the entire proxy, there was no way for the Inspector to know who was appointed to vote the stockholders' shares. Consequently, the Inspector properly refused to recognize the Committee's attempt to vote such proxies.

### The Wolf, Rentfro and Roberson Proxies

■ The fourth group of proxies with respect to which the Committee requests relief involves three Tri–State shareholders, Marshall Wolf (2,100 shares), Michael Rentfro (62 shares) and Irene Roberson (3 shares), each of whom signed and mailed two proxy cards—one from Management and one from the Committee—on the same day.

After reviewing each of the Committee proxy cards and the Management proxy cards bearing the same date, the Inspector determined that there was an inconsistent appointment of authority. Therefore, the Inspector treated the Wolf, Rentfro and Roberson proxy cards as a "standoff." Accordingly, the Inspector counted those proxies only for quorum purposes. The Inspector explained the reason for his conclusion as follows: "Our practice in handling stand-offs is to look at the dates. If the dates are the same, it's an inconsistent assignment of proxy committees. We don't look to the vote."

In each case, the same shareholder executed (i) a green, Management proxy card by signing and checking a box designated

---

22. Kissel–Blake received the telecopied proxies in Joplin at 8:18 A.M. The Annual Meeting did not start until 10:00 A.M. Kissel–Blake recognizes that it is important to include a full copy of a proxy when attempting to vote by telecopy.

In fact, Kissel–Blake's standard practice is to always telecopy both sides of a proxy. Kissel–Blake's representative acknowledged that its failure to include both sides of the four proxy cards in this case was a mistake.

"withhold authority" regarding any vote for Management's Nominees and (ii) a white Committee proxy card by signing and checking a box designating a vote "for" the Committee's Nominees.[23] The Committee argues that the Inspector erred as a matter of law because the proxies of Wolf, Rentfro and Roberson are consistent on their face and plainly show the intent of these shareholders to vote against Management and in favor of the Committee. This position cannot prevail for several reasons.

First, both slates of proxy representatives were appointed to exercise these stockholders right to vote. The Committee's Proxy Representatives were authorized to vote in the director's election and on all discretionary issues. Management's Proxy Representatives were directed to vote on the auditor retention issue and were also directed to vote on all discretionary issues, even though authority to vote for the election of directors was withheld. Second, and of paramount importance for the purpose of this case, each proxy, on its face, revoked all prior proxies. Since the Committee proxies and the Management proxies revoked each other and bear the same date, the proxies were plainly in conflict.

The decision of the Delaware Supreme Court in *Williams* is controlling. The Court held that inspectors must reject all identical but conflicting proxies when the conflict cannot be resolved from the face of the proxies. *Williams*, 273 A.2d at 265. The Committee argues that the proxies are not in conflict on their face with respect to the vote for directors. Assuming arguendo that the instructions to each proxy representative may have been consistent on the issue of the director's election, the designation of *both* representatives to vote on all discretionary issues and the mutual revocation language presented the Inspector with

a conflict that could not be resolved on the face of the proxies.[24] *Id.* at 265. The Inspector properly concluded that each of these proxies presented a "standoff."

## DEFENDANT'S COUNTERCLAIMS

The defendants have filed a counterclaim based on the manner in which the Inspector handled four additional categories of proxies. The circumstances underlying those claims and the Court's evaluation of each contention will be addressed separately.

### The Broker Overvotes

Q & R Clearing Corp. ("Q & R Clearing") holds 5,329 shares of stock of Tri–State for certain beneficial holders. The record holder of these shares is Cede & Co. ("Cede"). Cede gave an "omnibus" proxy to Q & R Clearing entitling Q & R Clearing to vote 5,329 shares of the total number of shares of Tri–State held of record by Cede. Q & R Clearing, in turn, authorized the IECA to vote the 5,329 shares of Tri–State which Q & R Clearing was entitled to vote under the proxy from Cede.

Pursuant to its authority to vote shares held by customers of Q & R Clearing, IECA issued proxies to vote 100 shares for Management and 6,200 shares for the Committee. Added together, the proxies submitted by IECA on behalf of Q & R Clearing exceeded, by almost 1,000 votes, the number of shares which Q & R Clearing was entitled to vote under the omnibus proxy from Cede.

As was its usual practice when it discovered a broker had voted more shares than it was allotted, the Inspector called IECA in order to determine the correct amount of votes that should be cast by Q & R Clearing. The Inspector talked to Charles Pasfield, Vice President of Corporate Client Services at IECA, who in turn spoke to Q &

---

**23.** Mr. Wolf's proxy expressing a vote "for" the Committee was limited to five of the seven persons comprising the Committee's Nominees. Mr. Rentfro and Ms. Roberson voted "For" all seven of the Committee Nominees.

**24.** The Committee argues that by signing two proxies, one of which authorized a vote for the Committee's Nominees and one of which with-

held authority to vote for Management's Nominees, the shareholders were acting like people who wear a belt *and* suspenders to hold up their pants. This analogy is incomplete because it fails to take into consideration the revocation language in the "belt" proxy which effectively undid the "suspender" proxy and vice versa.

R Clearing. Mr. Pasfield, in accordance with IECA's usual practice, called the contact person at Q & R Clearing who was previously known to IECA and who is specifically assigned the task of rectifying overvotes. Q & R Clearing instructed IECA to reduce the shares voted in favor of the Committee by 1,524 shares. This oral instruction was later confirmed in writing. Thus, Q & R Clearing, through IECA, cast, and the Inspector counted, 4,676 votes for the Committee and 100 votes for Management. Q & R Clearing did not vote the remaining 553 shares.

Tri–State argues the procedure followed by the Inspector cannot be reconciled with the rule of *Williams* or this Court's recent holding in *Blasius Industries, Inc. v. Atlas Corp.*, Del.Ch., 564 A.2d 651 (1988). In *Blasius*, a stockholder solicited consents to elect a new board, and the company solicited revocations of consents. A question arose as to whether a revocation for shares submitted by IECA (and other institutions) were intended to revoke proxies for shares as to which consents had previously been executed, or whether the revocations had been submitted by different stockholders than had submitted the consents. *Blasius*, 564 A.2d at 665.

During the proxy counting leading to the *Blasius* suit, an official of IECA called the inspectors and advised them that the revocations submitted by IECA were *not* intended to revoke consents submitted by IECA.[25] The inspectors did *not* take this extrinsic evidence (which trial testimony corroborated) into account in its tabulation. *Blasius*, 564 A.2d at 665–66. If it had, the outcome of the election would have been reversed. *Id.* at 665. Following the trial in *Blasius*, this Court held that the inspectors properly confined their inquiry to the face of the proxy cards, and were correct in not

relying on the extrinsic evidence furnished to them:

> In reviewing the computating of the outcome of a proxy fight or a consent contest, the law does not inquire into the subjective intent of either the record owner or the beneficial owner in the usual case.
>
> A legal test that made inquiry into the subjective wishes of ultimate owners relevant would, of course, threaten to convert every close proxy fight into protracted and costly litigation. The law has avoided that risk while attempting to preserve a credible claim to corporate democracy by announcing the rule that only record owners are entitled to vote and if any investor chooses to hold his stock in some fashion other than his own name, he thereby assumes the risk that involving intermediaries will entail. *See, e.g., The American Hardware Corporation v. Savage Arms Corporation*, Del. Supr., 136 A.2d 690 (1957); *Enstar Corp. v. Senouf*, Del.Supr., 535 A.2d 1351 (1987). Moreover, even as to record owners, the administrative need for expedition and certainty are such that judges of election (and reviewing courts absent fraud or breach of duty) are not to inquire into their intention except as expressed on the face of the proxy, consent or other "ballot."

*Id.* at 668 (footnote omitted).

In the present case, the Committee contends that, if the information elicited by the Inspector during the telephone inquiries is inconsistent with *Williams* and *Blasius*, "it does not follow that the Q & R Clearing proxy is void," *citing Chappel v. Standard Scale Supply Corp.*, Del.Ch., 138 A. 74 (1927) *aff'd in part, rev'd in part*, Del. Supr., 141 A. 191 (1928) and *Schott v. Climax Molybdenum Co.*, Del.Ch., 154 A.2d 221, 223 (1959).[26]

---

**25.** Instead, IECA had already matched the proxies and revocations received from beneficial holders. Where a consent was submitted to IECA and later revoked, IECA had not attempted to vote the shares. Thus, IECA submitted proxies for the "net" number of consents it received, *after* giving effect to corresponding revocations. The only revocations it submitted

to the inspectors were for shares which had never expressed a consent.

**26.** *Schott* is not a case involving an overvote by brokers. In *Schott*, the inspectors of election received multiple proxies from the same record owner broker. However, unlike the present case, the various proxies case were not in excess of the total registered in the broker's name.

In *Chappel*, the proxy in issue read as follows:

I, the undersigned, hereby vote 150 shares of stock for the following named persons to serve as directors for the ensuing year:

| D.L. Daly | 263 |
| John Gammell | 262 |
| W.P. McJunkin | 263 |
| R.H. Chappel | 262 |

138 A. at 75. There were seven vacancies on the board. The total votes purportedly cast equalled seven times the number of shares owned by the stockholder. *Id.* at 76. In *Chappel*, the Court concluded that it was clear that the stockholder wished to vote all of his shares in favor of the four nominees comprising the opposition slate, and that they had mistakenly thought that cumulative voting was permitted. *Id.* Therefore, the Court held that all of the shares, as reflected on the corporation's books, should be voted in the manner reflected on the proxy. *Id.*

The holding in *Chappel* is consistent with the rule later announced in *Williams* because the stockholders' intention to vote for one slate only was clear on the proxy itself and the maximum votes which could be cast by each stockholder was evident on the records of the corporation. Counting the votes to the fullest extent possible prevented stockholder disenfranchisement. However, the present case, unlike *Chappel* did not involve a situation in which all votes by the stockholder of record were cast for one slate. Some votes were cast for the Committee slate and other votes cast for the Management slate. The overvote could not be resolved from an examination of the records of Tri–State, when votes were cast for each opposing slate of directors.

The Delaware Supreme Court has recognized the problems that are inherent in the use of security depositories by brokerage firms in *Enstar Corp.*, 535 A.2d at 1354–55. The Supreme Court concluded that "the legal and practical effects of having one's stock registered in street name can-

not be visited upon the issuer. The attendant risks are those of the stockholder and where appropriate, the broker." *Id.*

In the interest of promoting certainty and finality in corporate elections, a valid proxy "must be executed by or on behalf of the holder of record, whether that holder is the beneficial owner, a trustee, agent or nominee." In this case, Tri–State cannot, and should not, be blamed for the failure of a nominee or broker to accurately execute a proxy for a beneficial owner. *Id.* The rule in *Williams*, which prohibits the consideration of extrinsic evidence, simply requires due care by the stockholder of record and avoids embroiling corporation "in a mass of confusion and uncertainty." *Id.* at 1356.

A soliciting group should exercise great care in dealing with brokers' proxies and should be prepared to clarify ambiguities before the meeting gets underway.

As a practical matter, the professional proxy solicitor is probably best able to check the final tabulations with the proxy clerks of brokerage firms in order to avoid errors of overvoting or revocations. This should be done before the brokers actually deliver their final proxies.

E. Aranow and H. Einhorn, *Proxy Contests for Corporate Control* 442–43 (2d ed. 1968).

■ In this case, the Committee, its proxy solicitor, and the beneficial owners who declined to avail themselves of the advantages of record ownership must bear a responsibility for the brokerage overvotes that occurred in the Tri–State election. *See Enstar Corp.*, 535 A.2d at 1355. The Inspector erred as a matter of law in the present case by receiving extrinsic evidence concerning the proxy submitted by IECA to vote the Q & R Clearing proxy. Since that proxy overvoted the stock it represented, and since that error could not be corrected by looking at the face of the proxy or the books and records of Tri–

---

*Schott,* 154 A.2d at 223. The Court held that although a subsequent proxy generally revokes a prior one, in the situation of a broker sending in conflicting proxies which did not in total

exceed its record ownership, the inspectors could properly conclude that the brokers were expressing the varying wishes of beneficial owners. *Id.*

State, the proxy should have been disregarded with no votes attributable to that proxy being cast for either Management or the Committee.

Management concedes that if the IECA proxy with respect to the Q & R Clearing shares is invalidated, a similar proxy from IECA with respect to shares held through Bear Stearns & Co. should also be disregarded. In that instance, Bear Stearns was entitled to vote 400 shares. IECA purported to vote 381 shares for Management and 100 shares for the Committee. After a telephone call to IECA, the votes for Management were reduced to 320 shares and those for the Committee to 80 shares.

### P & M Trucking Co., Inc.

■ P & M Trucking Co., Inc. ("P & M Trucking") is the record owner of 74 shares of Tri–State's common stock. The name and address listed on the books and records of Tri–State for P & M Trucking is as follows:

> P&M Trucking Co. Inc.
> c/o James D. Partin
> P.O. Box 1091
> Lake Alfred, FL 33850-1091

At the Annual Meeting, Management's Proxy Representatives voted the 74 shares owned by P & M trucking, based on a Management proxy signed by James D. Partin on June 27, 1989. The Management proxy is the only proxy delivered to the Inspector by either side with respect to the shares held by P & M Trucking. The Inspector determined not to count the P & M Trucking shares because Mr. Partin did not note on the proxy his authority to sign the proxy card on behalf of P & M Trucking.

The most closely analogous case that the Court could find to the present situation is *Gow v. Consolidated Coppermines Corp.*, Del.Ch., 165 A. 136, 147–48 (1933). In that case, the Court held that the Inspector committed legal error by failing to count proxies that were signed *only* in the name of a partnership or a corporation, without any indication of the individual who signed or that person's capacity or authority to

27. The term used by Churchill.

sign. The reasoning of the Court is equally applicable here:

> The question [here] is simply whether the firm authorized the person named in the proxy to act for it in the matter of voting its stock. It is a question of evidence only. When a firm in whose name stock is registered sends in a proxy signed in its name, it is reasonable to say that enough appears to give it the appearance of *prima facie* authenticity.... If [greater evidence of authorization] were the rule the use of proxies in corporate elections would be hedged about by almost prohibitive restrictions. It would sacrifice practice ability to mere form; and the securing of a quorum, which is already sufficiently difficult, would be rendered even more so.

*Id.* at 147–48.

Mr. Partin's name appears on the books and records of Tri–State. The fact that P & M Trucking chose to register its stock in care of James D. Partin, supports the presumption of Mr. Partin's authority to sign a proxy on behalf of P & M Trucking. Since Mr. Partin's apparent authority to sign the proxy card for P & M Trucking was reflected on Tri–State's books and records, the P & M Trucking proxy should have been counted by the Inspector. *Id.* at 148; *Williams*, 273 A.2d at 265.

### Proxygrams

At the Annual Meeting, the Committee was permitted to vote a total of 407 shares, for which the only evidence presented to create a proxy relationship were "proxygrams"[27] submitted by the Committee through Churchill Communications, Inc. ("Churchill"). The stockholders and number of shares who purportedly voted in this fashion are as follows:

| Name | Number of Shares |
|---|---|
| Bob Ostromecki | 100 |
| Jasper G. Cumbee | 103 |
| Johanna Banderbeek | 204 |

A proxygram is a method by which a stockholder is notified, and votes, by mailgram. The text of a proxygram is generat-

ed by a proxy solicitor and then is furnished to Churchill, which receives names and addresses of beneficial holders. The proxygram includes language identical to the printed proxy card, and an instruction sheet which allows the stockholder to call a toll free number and cast his vote by telephone.

CT considers proxygrams to be a reliable form of proxy and accepts them "in the same spirit that cards are accepted." Several commentators also favor a recognition of the validity of telegraphic proxies. *See, e.g.,* 5 W. Fletcher, *Cyclopedia of the Law of Private Corporation* § 2056 at 311 (rev. perm. ed. 1987) ("a telegram or cablegram ... appointing a proxy is a sufficient writing"); E. Aranow & H. Einhorn, *Proxy Contests for Corporate Control* 416 (2d ed. 1968) (inspectors of election should accept telegram proxies); Doty, *Tabulating Proxies at Meetings of Stockholders,* 24 Bus. Law. at 891 (Apr. 1969) (telegraphic proxies should be valid).[28] No Delaware[29] case has yet directly addressed the validity of proxygrams, although proxygrams have been used by stockholders frequently to vote on corporate matters.

Management argues that proxygrams fail to create the presumption of reliability which is a condition precedent to the acceptance of a proxy under Delaware law. In support of its position, Management cites the concurring opinion by Judge Sloviter of the Third Circuit in *Carey v. Pennsylvania Enterprises, Inc.,* 876 F.2d 333, 342 (3d Cir.1989):

> [T]he telegram proxies contain no shareholder's signature. There is also a complete absence of a paper trail which would evidence that the shareholder in

fact appointed Western Union or Churchill Computer Corp. to act as agent.

The possibility of fraud is patent, since nothing in this record suggests that the recipient of the 800 call had the ability to check whether the caller was in fact the shareholder. *See generally,* Varalla, *Datagram Proxies: Gaps at the Interface Between Law and Technology,* 2 The Computer Lawyer, August 1985 at 19, 20. Apparently the only information required of the putative shareholder was the identity of the shareholder. Anyone with the knowledge could vote the shares of a shareholder who, for one reason or another, such as illness, absence or disinterest, failed to vote the shares. It is even possible that this procedure could be used to override an earlier valid vote by the shareholder.

PEI argues that crediting telegram proxies is an accommodation to new technology and the computer age. This is an argument more properly addressed to the Pennsylvania legislature which may, if it so chooses, specifically provide for this type of voting of shares but which may also include various safeguards to insure that votes are properly cast and credited. Until the Pennsylvania legislature acts, I would hold that shares voted by proxies in the manner shown in this record are invalid and should not be credited.

Management argues that in this case, as in the *Carey* case, there is here "a complete absence of a paper trail," which would evidence that Churchill was appointed to act as agent for certain stockholders, and a complete absence of any procedure designed to prevent fraud.[30] In support of its position, the Committee points out that a conclusion which is contrary to Judge

---

**28.** Many jurisdictions outside of Delaware have explicitly provided for telegraphic proxies in their corporation statutes. *See, e.g.,* Cal.Corp. Code § 178 (West 1986); Conn.Gen.Stats.Ann. § 33–336(a) (West 1988); N.C.Gen.Stat. § 55–68(a) (1988); Ohio Rev.Code Ann. § 1701.48(B) (Anderson 1984).

**29.** This Court is familiar with the use of proxygrams. *See, e.g., Garrett v. Brown,* Del.Ch., C.A. No. 8423, slip op. at 21 n. *, Berger, V.C., 1986 WL 4872 (Apr. 22, 1986); *Wincorp Realty Invest-*

*ments, Inc. v. Goodtab, Inc.,* Del.Ch., C.A. No. 7314, slip op. at 4–5, Brown, C., 1983 WL 8948 (Oct. 13, 1983).

**30.** The record reflects that the Inspector had no knowledge as to how the proxygrams were solicited, arranged or authorized. The Inspector assumed that registered stockholders called Churchill Communication Corporation and instructed them to send proxygrams to Kissel-Blake.

Sloviter's view in *Carey* was reached in *Dynamics Corp. of America v. CTS Corp.*, 643 F.Supp. 215, 221 (N.D.Ill.1986). In the present case, in view of the rulings that have already been made, the Court finds that it is unnecessary and would, therefore, be inappropriate to decide whether or not proxygrams are permissible as a matter of Delaware law and, if they are, whether or not the proxygrams submitted in this case had the indicia of reliability which is required to make them presumptively valid.

*Conclusion*

As a result of the Court's rulings in this opinion, the following adjustments are required in the tabulations of the votes for Tri-State's directors:

| Defendants/Management | | |
|---|---|---|
| Plus | 74 | P&M Trucking |
| Minus | 320 | Bear Stearns |
| Minus | 100 | Q&R Clearing |
| Net Minus | ........ 346 | |

| Plaintiffs/Committee | | |
|---|---|---|
| Plus | 800 | Clever Trust |
| Minus | 4676 | Q&R Clearing |
| Minus | 80 | Bear Stearns |
| Net Minus | ........ 3956 | |

Nevertheless, even after these corrections, the results of the election of directors at the Tri-State Annual Meeting remain the same. Judgment is entered in favor of each party in accordance with this opinion.

SO ORDERED.