John A. ALLISON and John F. Kooken, Plaintiffs,

v.

Seymour PRESTON, Jr., and Andrew F. Puzder, Defendants,

and

The Corporation Trust Company, Michael J. Barbera and Frank J. Obara, Jr., Nominal Defendants.

Civ. A. No. 13538.

Court of Chancery of Delaware, New Castle County.

Date Submitted: July 19, 1994.
Date Decided: July 29, 1994.

R. Franklin Balotti, Daniel A. Dreisbach, and Todd C. Schiltz, Richards, Layton & Finger, Wilmington (Andrew E. Bogen, Gibson, Dunn & Crutcher, Los Angeles, CA, of counsel), for plaintiffs.

William O. LaMotte, III, Thomas R. Hunt, Jr., and Michael L. Vild, Morris, Nichols, Arsht & Tunnell, Wilmington (Milbank Tweed Hadley & McCloy, New York City, of counsel), for defendants Seymour Preston, Jr., and Andrew F. Puzder.

## OPINION

CHANDLER, Vice Chancellor.

This is an action pursuant to 8 *Del.C.* §§ 225 and 231, in which plaintiffs, John A. Allison and John F. Kooken (collectively "plaintiffs"), seek a declaration that they are duly elected directors of US Facilities Corporation ("US Facilities"), instead of defendants, Seymour Preston, Jr. and Andrew F. Puzder (the "Fidelity Directors"). Plaintiffs, shareholders and former directors of US Facilities, were replaced as directors of US Facilities at its May 25, 1994 annual meeting (the "Annual Meeting"), where defendants, The Corporation Trust Company, Michael J. Barbera and Frank J. Obara, Jr. (collectively the "Inspectors" and, together with the Fidelity Directors, "defendants") determined that the Fidelity Directors received more votes than plaintiffs and therefore were duly elected directors of US Facilities. Plaintiffs, however, contend that 80,368 shares held for plan participants in US Facilities' 401(k) Employees Savings Plan (the "Plan")—shares that were not counted by the Inspectors—should be counted in favor of plaintiffs. Consequently, plaintiffs seek relief in this Court.

The parties have stipulated to the pertinent facts; they request from the Court a determination and application to the foregoing facts of the correct law. Thus, the procedural posture of this case is identical to *Concord Financial v. Tri-State Motor Tr.,* Del.Ch., 567 A.2d 1 (1989) and, "to the extent that it is necessary to do so, factual disputes must be resolved by the Court." *Id.* This is my decision on plaintiffs' complaint for declaratory relief under §§ 225 and 231.

## I.

US Facilities is a Delaware corporation with approximately 5.7 million shares of common stock outstanding. Complaint Pursuant to 8 *Del.C.* §§ 225 and 231 ("complaint") at ¶ 6. In 1988, it adopted a profit sharing plan pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that was intended to insure the financial security of the employees of US Facilities. The Plan holds 80,481 shares of US Facilities common stock (the "Plan Shares") beneficially for its participants (the "Plan Participants"). The Plan Shares enjoy the same rights as most common stock, including the right to vote at the election of directors of US Facilities. Plaintiffs' Opening Brief ("Pls.' Op. Br.") at 5.

The Dreyfus Trust Company ("Dreyfus" or the "trustee") serves as trustee of the Plan. Pursuant to the trust agreement governing the Plan, Dreyfus must vote the Plan Shares as directed by the Plan Participants. *See* Appendix to Plaintiffs' Opening Brief ("Pls.' Op.Br.App.") Exh. 13 at ¶ 2.4(f). In April, 1994, in anticipation of US Facilities' annual meeting, Dreyfus, through its proxy vendor, provided the Plan Participants with US Facilities' initial set of proxy materials (the "management proxies") regarding election of three directors who would serve until the 1997 annual meeting of stockholders. These materials solicited support for the re-election of plaintiffs. Pls.' Op.Br. at 7.

Approximately four weeks before the Annual Meeting and after Dreyfus had mailed the management proxies to the Plan Participants, Fidelity National Financial, Inc. ("Fidelity") proposed to acquire the outstanding common stock of US Facilities. Fidelity stated that unless it could reach an acquisition agreement with US Facilities in the next four days, it would commence a proxy solicitation in opposition to management. Upon a determination by US Facilities that it could not make such a decision on short notice, a proxy contest ensued. Answering Brief of Defendants Seymour Preston, Jr. and Andrew F. Puzder ("Ds.' Ans.Br.") at 4.

On May 5, 1994, Fidelity sent its proxy materials (the "Fidelity proxies"), soliciting the election of the Fidelity directors, to the Bank of New York ("BONY"), the nominee of the record owner of the Plan Shares, Cede & Co.; BONY, in turn, mailed the proxy materials to Dreyfus. Although the parties have not established precisely the date that Dreyfus received the Fidelity proxies from BONY, it is agreed that as of May 13, 1994, Dreyfus had not distributed the Fidelity proxies to the Plan Participants. On that day, the proxy solicitors for Fidelity contacted Dreyfus to determine whether the proxies had been distributed. Dreyfus responded by stating that the Fidelity proxies would not be distributed because Dreyfus had received them "too late." *Id.* at 9.

On May 20, 1994, US Facilities' proxy solicitors contacted Dreyfus to determine whether Dreyfus had distributed to the Plan Participants a second set of proxy materials, soliciting support for plaintiffs, that contained information about Fidelity and its offer to buy US Facilities (the "revised management proxies"). Subsequent to that conversation (on that same day), Dreyfus distributed the Fidelity proxies and the revised management proxies to the Plan Participants via overnight mail. *Id.* at 10. In response to the proxy mailings, Dreyfus received proxies from the Plan Participants directing it to vote 80,386 of the Plan Shares in favor of plaintiffs. *See* Pls.' Op.Br.App.Exh. 19.

Unknowledgable about proxy contests, however, Dreyfus thought that it was required to return *both* the revised management proxy *and* the Fidelity proxy to the Inspectors, *each reflecting the mirror image vote of the other.* Accordingly, Dreyfus directed BONY to return the revised management proxy, indicating that 80,386 Plan Shares were voted FOR plaintiffs, as well as the Fidelity proxy, indicating that 80,386 Plan Shares were voted AGAINST the defendant Fidelity Directors. Pls.' Op.Br. at 8.

After BONY submitted to the Inspectors both proxy cards, reflecting a total vote of 160,848 Plan Shares (this number includes 38 Plan Shares that were voted: "withhold authority"), the Inspectors determined that the two proxy cards represented a "stand-off" because the proxies were inconsistent on their face and could not be reconciled. The

Inspectors therefore refused to count the 80,386 shares in favor of plaintiffs. As a result, the Inspectors determined that the Fidelity Directors were duly elected directors of US Facilities by a margin of 23,808 votes. It is uncontroverted that had the Inspectors not rejected the 80,386 Plan Shares that were voted in favor of plaintiffs, plaintiffs would have received a greater number of votes than the Fidelity Directors and would have been duly elected directors of US Facilities. *Id.* at 13.

One day later, on May 26, after a challenge session at which plaintiffs contested the Inspectors' decision to reject the 80,386 Plan Shares voted in favor of plaintiffs, the Inspectors certified the election results. Thereafter, on May 27, Dreyfus directed BONY to revoke the Fidelity proxy (the "Fidelity revocation"). The Inspectors determined not to act upon the revocation, and did not disturb the previously certified election results declaring the Fidelity Directors as two of the nine duly elected directors of US Facilities. Ds.' Ans.Br. at 8.

## II.

The issue central to plaintiffs' and defendants' dispute concerns whether this Court has the power to resolve whether plaintiffs or the Fidelity directors are duly elected directors of US Facilities. Upon a determination that this Court has that power, I must then determine whether it should be exercised given the facts of this case.

## A.

Plaintiffs argue that 8 *Del.C.* § 231 grants this Court the power to resolve the present dispute. Specifically, they contend that 8 *Del.C.* § 231(c) expressly grants to this Court the power to consider proxies or revocations that are submitted after the polls close. Thus, plaintiffs assert, I can and should acknowledge the Fidelity revocation, even though it was submitted after the polls closed, and direct the Inspectors to count the 80,386 Plan Shares voted on the management proxy in favor of plaintiffs. Alternatively, plaintiffs contend that 8 *Del.C.* § 231(d)—the overvote provision relating to proxies—provides another basis for relief. They contend that when BONY submitted both proxies, thereby attempting to exercise voting rights of over 160,000 Plan Shares, it overvoted the Plan shares by attempting to vote more shares than it represented as nominee. Plaintiffs argue that section 231(d), which permits inspectors to consider extrinsic evidence beyond the face of the proxies when an overvote occurs, should therefore be invoked here. Accordingly, plaintiffs ask me to direct the Inspectors to consider extrinsic evidence regarding the Plan Shares, namely the Fidelity revocation and the intent of the Plan Participants, so that the Inspectors can determine that the 80,386 Plan Shares they previously refused to count should be voted in favor of plaintiffs.

Defendants, on the other hand, contend that both subsections of 8 *Del.C.* § 231 cited by plaintiff as bases for relief cannot be invoked by the Court given the facts of this case. First, they assert that 8 *Del.C.* § 231(c) gives this Court the power to consider a post-closing revocation only when closing of the polls was manipulated in an attempt to alter the election results. Because that did not occur here, defendants contend, this Court does not have the power to provide post-closing of the polls relief when the Inspectors did not act wrongfully. Defendants also argue that the facts here do not represent the type of overvote 8 *Del.C.* § 231(d) was created to remedy. They allege that § 231(d) was created to prevent "tainting" or discounting of several blocks of shares when one block is "overvoted". Because shares other than Plan Shares were not tainted by the Inspectors' failure to count the 80,386 Plan Shares, defendants contend that § 231(d) cannot provide a basis for relief.

## B.

It is apparent to me that the breadth of power granted to the Court pursuant to 8 *Del.C.* § 231(c) and (d) and the circumstances under which it may be properly exercised is a critical issue to be determined. However, I need not decide that issue here because the power of the Court to resolve the controversy currently before it is well established in

existing precedent as well as in 8 *Del.C.* § 225.

It is certainly indisputable that the Court of Chancery is the forum to provide the relief that plaintiffs seek. In a broad sense, the dispute before me is no different from the myriad of other proxy contest/contested elections this Court has been resolving since the 1920s. *See, e.g., In re Giant Portland Cement Co.*, Del.Ch., 21 A.2d 697 (1941) (Court adjudicated whether certain votes cast for management were improperly rejected by the inspectors); *In re Canal Const. Co.*, Del. Ch., 182 A. 545 (1936) (Court determined whether certain shares were entitled to be voted at an election of directors and, if so, who was rightfully entitled to exercise those votes); *Rice & Hutchins Inc. v. Triplex Shoe Co.*, Del.Ch., 147 A. 317 (1929) (Court declared slate "A" directors elected, instead of slate "B"—whom the inspectors had previously declared as elected—because the inspectors wrongfully accepted the votes of certain common stock and did not accept the votes of certain preferred stock). This Court continues to resolve those same disputes today pursuant to 8 *Del.C.* § 225, which provides:

> the Court of Chancery may hear and determine the validity of any election of any director ... and, in case any such office is claimed by more than 1 person, may determine the person entitled thereto; and to that end make such order or decree in any such case as may be just and proper....

8 *Del.C.* § 225; *see also, Concord Financial*, 567 A.2d at 1; *Blasius Industries Inc. v. Atlas Corp.*, Del.Ch., 564 A.2d 651 (1988). Thus, the power of this Court to review determination of "who is validly elected" in proxy contests has *always* been an aspect of the Court's common law and statutory authority.

### III.

Having determined that the Court has ample inherent authority under § 225 and the foregoing precedents to grant plaintiffs relief, only one question remains: should that authority be exercised given the facts of this case? I think it is clear that the answer to that question is yes.

### A.

■ First, the parties do not dispute that the Plan Participants intended to vote for plaintiffs. They indicated that intent by returning to Dreyfus the management proxies, voting 80,386 Plan Shares in favor of plaintiffs. *See* Pls.' Op.Br.App.Exh. 19. BONY's attempt to revoke the Fidelity proxy is further evidence of this intent. *See id.* at Exh. 9. Secondly, it is uncontroverted that the Plan Participants' intent to vote for plaintiffs was not effected solely due to a breach of duty by Dreyfus. Both ERISA and the trust agreement governing the Plan require Dreyfus (or the acting trustee) to vote the Plan Shares in accordance with the directions of the Plan Participants. When Dreyfus submitted both the management proxy and the Fidelity proxy, however, it failed to do this, thus breaching the duty of care it owed the Plan Participants. Finally, plaintiffs and defendants do not dispute that the Plan Participants were required by federal statutory law to hold their shares through a trustee, the very relationship that led to the Plan Participants being disenfranchised from their voting power. These facts, together, compel me to grant plaintiffs the relief they seek.

### B.

Defendants contend, however, that well-established Delaware law dictates that the Plan Participants, having chosen to hold their shares of US Facilities in the name of a nominee, must accept the risks of that arrangement, including the risk that the nominee might vote their shares incorrectly. *See, e.g., Enstar Corp. v. Senouf*, Del.Supr., 535 A.2d 1351 (1987) ("The legal and practical effects of having one's stock registered in street name cannot be visited upon the issuer. The attendant risks are those of the stockholder ..."); *American Hardware Corp. v. Savage Arms Corp.*, Del.Supr., 136 A.2d 690 (1957) ("If an owner of stock chooses to register his shares in the name of a nominee, he takes the risks attendant upon such an arrangement"). I do not agree. As explained below, *Enstar* and *American Hardware* do not control these facts and I

am not persuaded that the Plan Participants should bear the risk of Dreyfus' breach of its fiduciary duty to them.

The Plan Participants, in the limited circumstances of this case, are in a different position than the beneficial holders involved in either *Enstar* or *American Hardware*. In both *Enstar* and *American Hardware*, the investors who were forced to bear the risks associated with indirect ownership of stock, voluntarily chose to hold their stock in the name of a nominee. In other words, after the *Enstar* and *American Hardware* shareholders made the decision to invest, they made an *additional, voluntary* decision to hold their investment in the name of a nominee. The *Enstar* and *American Hardware* courts thus held that, having made a voluntary decision to hold their shares indirectly, the shareholders should bear the risks associated with such an arrangement.

The decision making process that drove the result in *Enstar* and *American Hardware* is absent here, however. ERISA *forbids* the Plan Participants from holding shares in their own name. 29 U.S.C. § 1103. The Plan Participants did not choose to have their stock held by a nominee; rather, they were required by federal statutory law to do so. Unlike the shareholders in *Enstar* and *American Hardware*, once the Plan Participants in this case chose to invest in the Plan, they had no choice as to whether to hold their stock directly or indirectly. The fact that the Plan Participants chose to avail themselves of the benefits of the Plan, thereby subjecting themselves to the statutory scheme of ERISA, should not subject them to additional risks by virtue of their stock being held by a trustee. Accordingly, I am of the opinion that the Plan Participants should not be forced to bear the risk of a breach of duty by the trustee by virtue of the holdings in *Enstar* and *American Hardware*—these cases are distinguishable.

## C.

Defendants also argue that this fact situation is clearly governed by *Williams v. Sterling Oil of Oklahoma*, Del.Supr., 273 A.2d 264 ("*Williams II*"), where the Supreme Court determined that inspectors in a proxy contest cannot consider extrinsic evidence for the purpose of correcting a mistake on the face of a proxy. Defendants contend that because the Inspectors acted correctly here by not considering extrinsic evidence relating to the Plan Participants' intent, plaintiffs are not entitled to relief.

Although, as defendants correctly assert, *Williams II* is the leading case regarding resolution of two identical but contradictory proxies received in a corporate election, it, too, does not control the facts here. In that case, an agent for a brokerage firm submitted to the election inspectors two virtually identical proxies, one purporting to vote for management, and another purporting to vote for an insurgent slate of directors. The submission of the proxy purporting to vote for the insurgent slate was in error, and was declared an error in an affidavit submitted to the inspectors after submission of the proxies. On the basis of that affidavit, the inspectors of the election honored the intent of the proxy holders and voted the shares in question in favor of the management slate. A shareholder filed suit in the Court of Chancery, alleging that the inspectors exercised authority greater than that accorded to them by considering the affidavit presented by the brokerage firm. The shareholder-plaintiff contended that an inspector's duties are ministerial and do not include looking beyond the face of a proxy to determine its validity. The Court of Chancery, per Vice-Chancellor Short, disagreed, holding that the inspectors rightfully considered the extrinsic evidence submitted to it in the form of the affidavit, and opining, "[t]he case here involves a clerical mistake easily corrected by an explanatory affidavit, and the resolution of the mistake, unlike a question of a forged proxy, is not a judicial determination," and therefore within the inspectors' realm. *Williams v. Sterling Oil of Oklahoma, Inc.*, Del.Ch., 267 A.2d 630 (1970) (*Williams I*), rev'd, *Williams II*, 273 A.2d 264. On appeal, the Supreme Court reversed and held that when a "stand-off" occurs, inspectors are limited to correcting proxies only when corrections can be made from the face of the proxies or by inspecting the regular books and records of the corporation. *Williams II*,

273 A.2d at 265. The Court held that when the inspectors consulted extrinsic evidence they improperly entered the realm of the quasi-judicial. *Id.* at 266. Based on *Williams II,* Justice Holland, sitting in the Court of Chancery by designation, concluded in *Concord Financial* that the inspectors of an election acted properly by treating two conflicting proxies as a "stand-off," and not counting the shares represented by those proxies because the conflict could not be resolved on the face of the proxies. *Concord Financial,* 567 A.2d at 14.

These cases concern only the limited powers *inspectors* may rightfully exercise; they do not address the type of powers exercisable by a *court* in those situations. Here, plaintiffs ask this Court to use its equitable and statutory powers to grant them relief; I find nothing in the holdings of *Williams II* or *Concord Financial* that would preclude me from granting that relief.

### D.

Finally, I wish to address three other considerations that compel me to grant plaintiffs the relief they seek. One I have discussed briefly already—that is, plaintiffs' claim that the Plan Participants' votes were cast inconsistently with their intent *because* of a breach of fiduciary duty by the agent charged with exercising the proxy. This particular fact persuades me that I am entitled to consider the Plan Participants' intent in determining whether plaintiffs or the Fidelity directors are duly elected directors of US Facilities. I am not alone in this belief as Chancellor Allen has previously stated that where fraud or a breach of duty is alleged, the Court may wish to inquire into the subjective intent of the record owner or beneficial owner, even though this is not a proper inquiry in the usual case. *Blasius Industries Inc. v. Atlas Corp.,* 564 A.2d at 668 n. 13. Second is the consideration that absent exercise of this Court's equitable power to prevent a wrong, the Plan Participants will be disenfranchised from their power to vote the Plan Shares. This is so because according to *Williams II* and its progeny, the Inspectors were powerless to consider Dreyfus' breach of duty or the undisputed intent of the Plan Partici-

pants, given the fact that they determined the proxies submitted by BONY represented a "stand-off." Thus, the result I reach is consistent with the policy in our law that disfavors disenfranchisement. *See, e.g., Williams II,* 273 A.2d at 265. Finally, I am not persuaded that by granting plaintiffs relief, I will be opening the floodgates of litigation and "threaten[ing] to convert every close proxy fight into protracted and costly litigation," as defendants argue. My holding is based on the very particular, compelling facts of this case: the Plan Participants' clear, unambiguous intent to vote for plaintiffs; Dreyfus' breach of duty in failing to effect that intent; and the federal statutory requirement forbidding the Plan Participants to hold their stock directly. These specific facts limit greatly the circumstances upon which an aggrieved shareholder or director can base a request to this Court for relief and I am confident that, as a result, our law's concern to promote certain and expeditious elections is not threatened.

Accordingly, a proper application having been made under § 225, the Court has the authority under the aegis of 8 *Del.C.* § 225, well established precedent and *Blasius Industries Inc. v. Atlas Corp.,* Del.Ch., 564 A.2d 651 (1988) to consider Dreyfus' breach of duty and correct the election results so as to prevent disenfranchisement of the Plan Participants' voting power. The 80,386 Plan Shares that the Inspectors refused to count should be voted in favor of plaintiffs, resulting in plaintiffs being the duly elected directors of US Facilities. Having thus concluded that plaintiffs are entitled to relief in these circumstances, I decline to reach plaintiffs' other arguments.

### IV.

Where the clear and obvious intent of beneficial shareholders, who hold their shares through a trustee by virtue of a federal law requiring them to do so, is not effected due to a breach of duty by the trustee charged by law to carry out their intent, they should be afforded relief. Section 225 of our corporation law and long established precedents provide this Court with the power to grant such relief. Accordingly, the 80,386 Plan Shares

voted on the management proxy in favor of plaintiffs, previously rejected by the Inspectors, should be counted as votes for plaintiffs. Plaintiffs, not the Fidelity directors, are therefore declared the duly elected directors of US Facilities.

Judgment is entered in favor of the plaintiffs in accordance with this Opinion.

IT IS SO ORDERED.