Seymour PRESTON, Jr. and Andrew F. Puzder, Defendants Below–Appellants,

v.

John A. ALLISON and John F. Kooken, Plaintiffs Below–Appellees.

No. 296,1994.

Supreme Court of Delaware.

Submitted: Sept. 27, 1994.
Decided: Dec. 14, 1994.

William O. LaMotte, III, Thomas R. Hunt, Jr., Michael L. Vild of Morris, Nichols, Arsht & Tunnell, Wilmington, and Scott A. Edelman (argued); David J. Wolfson of Milbank Tweed Hadley & McCloy, New York City, of counsel, for appellants.

R. Franklin Balotti (argued), Daniel A. Dreisbach, Matthew J. Ferretti, and Todd C. Schiltz of Richards, Layton & Finger, Wilmington; Andrew E. Bogen of Gibson, Dunn & Crutcher, Los Angeles, CA, of counsel, for appellees.

Before VEASEY, C.J., WALSH and BERGER, JJ.

BERGER, Justice:

This is an appeal from a decision of the Court of Chancery overturning the results of an election of directors and declaring, pursuant to 8 *Del.C.* § 225, that appellees, John A. Allison and John F. Kooken, are the duly elected directors of US Facilities Corporation ("US Facilities"). The issue we address is whether an admitted mistake in effectuating beneficial stockholders' voting instructions should be corrected by the Court of Chancery, notwithstanding the holding in *Williams v. Sterling Oil of Oklahoma, Inc.,* Del.Supr., 273 A.2d 264 (1971). We conclude that, where one is required by law to hold his or her shares beneficially, the investor should not be disenfranchised as the result of the

record stockholder's mistaken submission of conflicting proxies. Accordingly, we affirm.

## I.

The relevant facts are undisputed. US Facilities, a Delaware corporation, has approximately 5.7 million shares of common stock outstanding. The company has a nine member staggered board of directors, with three directors elected each year to serve a three year term. Dr. L. Steven Medgyesy and appellees were nominated by the company for re-election as directors at the 1994 annual meeting, held on May 25, 1994. US Facilities sent its stockholders proxy cards, a notice of the meeting, and a proxy statement on April 19, 1994.

On April 25, 1994, William P. Foley, II ("Foley"), President and Chief Executive Officer of Fidelity National Finance, Inc. ("Fidelity"), contacted his counterpart at US Facilities and proposed a merger in which Fidelity would acquire all the outstanding shares of US Facilities for $15 per share. Foley explained that his merger proposal would expire on April 29, 1994, and that, if US Facilities was unwilling to enter into negotiations, Fidelity would commence a proxy solicitation in opposition to management. Foley was not satisfied with the response he received from US Facilities. Accordingly, Fidelity distributed a proxy statement dated May 3, 1994, seeking the election of appellants as directors of US Facilities and proposing the adoption of a stockholder resolution calling for the sale or merger of the company.

On May 26, 1994, the independent company retained to act as inspector of elections certified that appellants had been elected to replace appellees by a vote of 2,216,430 to 2,192,622. In certifying this result, the inspector refused to count 80,424 shares beneficially owned by members of a US Facilities retirement plan. In 1988, the company adopted a retirement plan (the "Plan") pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 *U.S.C.* §§ 1001 *et seq.* ("ERISA"). The Plan offers several investment options for its participants, including a fund consisting of common stock of US Facilities. As mandated by ERISA, the US Facilities stock purchased on behalf of Plan participants is held in trust. 29 *U.S.C.* § 1103. Plan participants are entitled to vote their shares, but must do so by instructing the Plan trustee, the Dreyfus Trust Company ("Dreyfus").[1] As of the record date for the 1994 annual meeting, the Plan held 80,481 shares of US Facilities common stock.

In accordance with its responsibilities as trustee, Dreyfus distributed the company's initial proxy solicitation materials to Plan participants in April 1994. On May 20, 1994, Dreyfus sent the Fidelity proxy materials and US Facilities' revised materials to Plan participants by overnight mail. In response to these mailings, Dreyfus received instructions to vote 80,386 of the Plan shares in favor of appellees and to "withhold authority" with respect to 38 shares.[2] Unfortunately, neither the Dreyfus employee responsible for voting the shares, nor the contact person at the proxy tabulation firm hired to assist Dreyfus, had any prior experience with proxy contests. As a result, when they saw that there were two different proxy cards, they decided that both cards had to be submitted to the inspector of elections. Thus, Dreyfus instructed BONY to submit the revised management proxy, marked to show that 80,386 Plan shares were voted for appellees and the Fidelity proxy, marked to show that 80,386 Plan shares were voted against appellants.

These "mirror-image" proxies were intended by Dreyfus to confirm, from either perspective, the Plan participants' instructions— the 80,386 shares were to be voted in favor of the management slate and against the Fidelity slate. BONY executed the proxy cards exactly as instructed and submitted each proxy to the appropriate proxy solicitor. The solicitors, in turn, submitted those prox-

---

1. Cede & Co. ("Cede") is actually the record holder of the Plan shares. Pursuant to an omnibus proxy granted by Cede, The Bank of New York ("BONY") votes the Plan shares. BONY casts its votes as instructed by Dreyfus.

2. Dreyfus interpreted the "withhold authority" instruction to mean that the 38 votes should be cast in favor of appellants.

ies to the inspector of elections. The inspector determined that the two proxies were inconsistent on their face and could not be reconciled. Therefore, the inspector refused to count the 80,386 shares voted on behalf of the Plan participants. All agree that, had those votes been counted, appellees would have prevailed.

## II.

The sole issue before this Court is whether the Court of Chancery departed from established legal principles in holding that the Plan shares should be voted in accordance with the participants' intent, even though that intent could not be discerned from the two irreconcilable proxies submitted on their behalf. This is a question of law that is subject to de novo review. *City Investing Co. Liquidating Trust v. Continental Casualty Co.*, Del.Supr., 624 A.2d 1191, 1194 (1993).

The leading authority on this point is *Williams v. Sterling Oil of Oklahoma, Inc.*, Del.Supr., 273 A.2d 264 (1971). In that case, Parker, Bishop & Welsh, Inc. ("PBW"), a brokerage firm, submitted two proxies voting the same shares for opposite positions. Both proxies were signed by the same person and came in envelopes postmarked the same day. The election inspectors initially left the PBW shares out of their tabulation. However, before the inspectors' final report had been submitted, a PBW officer gave them an affidavit explaining the two proxies. The affidavit stated that PBW wanted to vote all of its shares in favor of management; that the employee who submitted the dissident proxy did so by mistake and without authority; and that PBW declared the dissident's proxy to be void and of no effect. Based upon that affidavit, the inspectors included PBW's shares in their final tabulation as having been voted in favor of management. The Court of Chancery, although recognizing that election inspectors perform only a ministerial function, held that they properly counted the PBW shares because the two conflicting proxies were the result of an "obvious clerical mistake." *Williams v. Sterling Oil of Oklahoma, Inc.*, Del.Ch., 267 A.2d 630, 633 (1970). This Court reversed:

We hold the proper rule to be that, in the exercise of their ministerial functions and powers, the inspectors of an election must reject all identical but conflicting proxies when the conflict cannot be resolved from the face of the proxies themselves or from the regular books and records of the corporation.... This rule is dictated by the necessity for practical and certain procedures in the fair handling of proxies and the expeditious conclusion of corporate elections.

\* \* \* \* \* \*

We agree, of course, that the correction of clerical mistake should be favored over disenfranchisement; but not at the price of uncertainty of procedure, impractical delay in election results, or possible invitation to fraud.

*Williams v. Sterling Oil of Oklahoma, Inc.*, 273 A.2d at 265.

The *Williams* rule has been followed consistently over the past 20 years. In *Concord Financial Group Inc. v. Tri–State Motor Transit Co.*, Del.Ch., 567 A.2d 1 (1989), for example, the Court of Chancery considered, among other challenges to a stockholder vote, the election inspector's failure to count four telecopied proxies. The stockholders had sent their fully executed proxies to the proxy solicitor in New York. On the morning of the annual meeting, the proxy solicitor telecopied the front side of the proxy cards to its representatives at the meeting site. The telecopied side of the proxy card included the name of the stockholder, number of shares owned, voting instructions, and the stockholder's signature. What was missing, because the back side of the card had not been telecopied, was the designation of a person or firm to vote the shares. Applying *Williams*, the trial court upheld the inspector's refusal to count the telecopied proxies, finding that the clerical error could not be corrected from the proxy itself or the books and records of the corporation. *See also Blasius Industries, Inc. v. Atlas Corp.*, Del. Ch., 564 A.2d 651, 668 (1988) ("In reviewing the computating of the outcome of a proxy fight or a consent contest, the law does not inquire into the subjective intent of either the

record owner or the beneficial owner in the usual case"); *Parshalle v. Roy*, Del.Ch., 567 A.2d 19, 23 (1989) ("That an internal mistake or misunderstanding among [the stockholder's] general partners may have led to the later-dated proxy, is not a fact of which the inspector or this Court may take cognizance").

Here, as in *Williams* and *Concord Financial*, the stockholders' voting instructions were clear but the proxies that were delivered to the inspector of elections created a conflict that could not be resolved from the proxies themselves or the corporation's books and records. Why, then, should *Williams* not control? The answer, as the Vice Chancellor discerned, comes from an analysis of the competing interests that *Williams* attempted to reconcile.

█ A stockholder's ability to participate in corporate governance through the election of directors is a fundamental part of our corporate law. Thus, there is a "general policy against disenfranchisement." *Centaur Partners v. Nat. Intergroup, Inc.*, Del.Supr., 582 A.2d 923, 927 (1990) (quoting *Blasius Indus. v. Atlas Corp.*, 564 A.2d at 669). However, corporations require certainty and expedience in the decision-making process in order to operate effectively. As a result, although many investors choose to hold their stock through brokers or depository companies, the corporation generally is entitled to rely on its own stock list and recognize votes or other stockholder action only when initiated by the stockholder of record. *Enstar Corp. v. Senouf*, Del.Supr., 535 A.2d 1351, 1355 (1987); *American Hardware Corp. v. Savage Arms Corp.*, Del.Supr., 136 A.2d 690, 692 (1957). If a beneficial stockholder is disenfranchised because of the record stockholder's failure to follow instructions, no relief is afforded in the usual case. As the *American Hardware* Court explained, the beneficial stockholder who "chooses to register his shares in the name of a nominee, ... takes the risks attendant upon such an ar-

rangement...." *Id.* Implicit in *Williams*, likewise, is the recognition that PBW was free to choose its method of voting and the person in whom it would entrust that responsibility. As a result, a careless mistake by PBW's employee was not allowed to overturn and delay the election results.

The Plan participants who were disenfranchised by Dreyfus's mistake had no similar choice. They were required by law to hold their shares in the name of the Plan trustee and could do nothing to assure that their votes were properly transmitted to the company. Under these circumstances, we agree with the Court of Chancery, that *Williams* does not apply. It is not enough to say, as appellants do, that the Plan participants could have avoided this problem by choosing not to invest in US Facilities stock. The premise behind the "assumption of risk" analysis in this Court's earlier decisions was that those who invest in a company's stock have it within their power to assure that their votes are counted. Where stockholders are forced, by statute, to give up that control, we conclude that they should not bear the risk of the trustee's mistake.

In reaching this conclusion, we are not unmindful of appellants' contention that this decision will "open the floodgates." Appellants argue that, since institutional investors form a significant part of the stockholder population, the principle announced here will seriously compromise the certainty of future corporate elections. We do not anticipate such a result. There is no reason to believe that professional proxy firms frequently transmit duplicate, conflicting proxies or that those mistakes that occasionally are made will involve a large enough number of shares to be dispositive. Moreover, the types of errors that now may be corrected should be capable of prompt resolution by the election inspectors or, if need be, by the court.[3]

---

3. The Court of Chancery read *Williams* as restricting the inspector's power to correct mistakes, but not the Court's. We disagree. Although the Court of Chancery has the *power* to hear and decide such an issue, *Williams* instructed the Court not to exercise its power in the limited circumstances described.

For the foregoing reasons, the decision and order of the Court of Chancery declaring appellees to be the duly elected directors of US Facilities is AFFIRMED.