Nicholas **MAINIERO**, Robert Mauro and Natale Picco, Plaintiffs,

v.

**MICROBYX CORPORATION,** a Delaware corporation, Defendant.

C.A. No. 14228.

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 27, 1996.

Decided: Sept. 18, 1996.

Revised: June 23, 1997.

Robert J. Stearn, Jr., of Richards, Layton & Finger, Wilmington, for Plaintiffs.

Stephen E. Jenkins and Regina A. Iorii, of Ashby & Geddes, Wilmington, for Defendant.

John A. Faraone, Wilmington, for Intervenors.

## OPINION

STEELE, Vice Chancellor.

The issue presented by the pending motions to reargue lead to the single conclusion that, in a highly combative contest for corporate control, strict adherence to the traditional rule, that the validity of a proxy must be determined from the face of that proxy, is particularly important. Thus, when neither the record holder nor the beneficial holder of shares can be determined from the face of the proxy, those shares may not be counted. By the same token, in the absence of evidence tending to show an apparently authorized signer of a proxy is not so entitled, those shares must be counted. The motion for reargument is granted. The order addressing the status quo need not be readdressed.

### I. Motion To Reargue

Reconsideration of issues already presented and decided rarely serves the parties' interests or the publics' interest. The movant must demonstrate "the Court has overlooked a decision or principle of law that would have controlling effect or the Court has misapprehended the law or the facts so that the outcome of the decision would be affected." *Stein v. Orloff,* Del. Ch., C.A. No. 7276-NC, Hartnett, V.C. (Sept. 26, 1985), Mem. op. at 3, 1985 WL 21136. The law on

this point is well settled and further discussion of the standard is unnecessary.

### A. Background

Pursuant to my order of January 3, 1996, Microbyx Corporation ("Microbyx") held a meeting of the shareholders on March 14, 1996 under the direction of the Master in Chancery. In his April 22 report on the meeting the Master made determinations regarding the inclusion or exclusion of a large number of Microbyx shares. The determinations included the effect of the dissolution of an injunction in the United States District Court for the District of Connecticut, and the inclusion and exclusion of numerous proxies presented at the meeting. In the end, the incumbent slate of directors (the "Pridgen faction") retained their seats, defeating the rival slate (the "Andresen faction"). Argument on exceptions to the Master's report was heard on July 23, 1996, and a letter opinion followed on August 15, 1996.

In the August 15 consideration of exceptions to the report, I did not accept the Master's conclusion regarding the dissolution of the injunction issued in the District of Connecticut action. His conclusion, contrary to the intent of that Court, served to preclude the Andresens from voting their Microbyx shares. The addition of these 180,800 shares reversed the result of the election to favor the Andresen faction. The Pridgen faction does not now challenge this conclusion, but argues the opinion did not address another of their exceptions to the report. That objection concerned the Master's decision to include 18,785 shares purportedly beneficially held by Elizabeth Andresen Massey. The Pridgen faction claims a decision in their favor on this issue would change, yet again, the results of the Microbyx board of directors' election.

As the result of the August 15 opinion, the Andresen faction had 725,107 votes, and the Pridgen faction 712,130; a difference of 12,977 votes. If the Pridgen faction is correct, and the 18,785 votes ought not to have been included, the election result will again be changed. This issue was therefore dispositive and ought to have been decided in the August 15 opinion.

### B. The Jaeger Proxies

#### 1. The Master's Report:

"[B]ecause a Master's report is not a formal adjudication of a dispute, but is meant to be an advisory recommendation" the applicable standard of review is *de novo*. *Vaughan v. Creekside Homes, Inc.*, Del. Ch., C.A. No. 1043–S, Jacobs, V.C. (Oct. 7, 1994), Mem. op. at 2, 1994 WL 586833 (internal quotations and citation omitted). Nevertheless, because the Master is the first hand observer of the facts, the findings of his final report must be reviewed with considerable deference. *See Chesla v. Patton*, Del. Ch., C.A. No. 12299–NC, Steele, V.C. (August 13, 1996), Mem. Op. at 4–5, 1996 WL 466962. At the election, the officials were presented with 2 identical proxies for 18,785 shares (a total of 37,570 shares), signed "Earl E. Jaeger, V.P." The officials were also presented with faxed copies of Everen Securities statements of account listing both Marc Andresen and Elizabeth Andresen Massey as having 18,785 shares of Microbyx in their accounts. Though she is not the record owner of any Microbyx shares, the officials received a proxy executed by Elisabeth Andresen Massey in her own name, voting 18,785 shares. *See* Letter from Robert J. Stearn, Jr. to the Court of July 5, 1996 (the "July 5th Letter"), at 2–3, Exh. C. (attaching above described proxies and statements). The stock ledger listed Everen Clearing Corporation as the owner of 38,610 shares. It was argued to the officials the shares voted by Mr. Jaeger's proxies (totaling 37,570 shares) were beneficially owned by Marc Andresen and Elizabeth Massey, and Mr. Jaeger was a Vice President of Everen Clearing Corporation and authorized to vote the shares. Presented with this evidence, the election officials excluded both the Jaeger proxies and the Massey proxy.

The Master concluded the election judges had been correct in excluding the shares purportedly voted on behalf of Marc Andresen, but incorrect in excluding the shares of Elisabeth Massey. *Special Master's Return on Annual Meeting of Microbyx Corp., Held March 14, 1996*, Del Ch., C.A. No. 14228, Kiger, Master (Apr. 22, 1996), at pp. 11–12

(the "Master's Report"). Unfortunately, the Master's report sheds little light on the basis of his decision. It notes only that a "valid proxy [was] filed for Elisabeth Massey[.]" *Id.* As to Marc Andresen's proxy shares, the Master noted it was "signed more or less illegibly by someone whose name appears to be 'Carl Jueger, V.P.', but vice president of what, or to what effect a proxy is given, and for what, is unknown. The purported proxy for Marc Andresen's shares is invalid on its face and so the 18,750 [sic] shares attributed to him may not be counted." *Id.*

On the record before me, the only additional information in favor of the Massey shares is the proxy for 18,785 shares executed in her own name. The Master must, therefore, have concluded the additional proxy of Elisabeth Massey resolved any doubts concerning the effect of at least one of the proxies signed by Mr. Jaeger. Correspondence between counsel for the Pridgen faction and the Master seemingly confirms this conclusion. It also confirms the conclusion reached by the Master with regard to these shares to have been incorrect.

Immediately following the release of the Master's report, counsel for the Pridgen faction sought and received clarification regarding these shares. *See* Letter from Regina Iorii to Master Kiger of April 23, 1996; Letter from Master Kiger to Regina Iorii April 23, 1996. The Master explained the basis of his conclusion as follows:

> I believe you are correct that CT [the inspector of the elections] deducted all of the Everen shares. I reviewed the files several times later, however, to assure myself that I had not misunderstood any of the challenged proxies, and it seemed to me that the back-up material for Elisabeth Massey's proxy was adequate, but that the same could not be said for her brother's, and so I added back the Massey shares that CT had deducted.

Letter from Master Kiger to Regina Iorii of April 23, 1996.

In their original exceptions to the Master's Report and on reargument, the Pridgen faction argues the proxy purportedly for Elisabeth Massey was identical to the one submitted on behalf of Marc Andresen, which was rejected by the Master. The crux of their argument is if one was rejected, the other should likewise have been rejected, and the individually executed proxy of Elisabeth Massey is irrelevant. Specifically, the Pridgen faction advances the following objections: 1) the signatures on the Jaeger proxies were nearly illegible; 2) the proxies did not identify the record owner of the shares; and 3) the proxies did not identify the relationship between the record owner and the signer. In opposition, the Andresen faction contends these objections are picayune, not supported by case law, and outweighed by this state's policy against the disenfranchisement of shareholders.

## 2. Legal Standard:

It has long been the rule to exclude extrinsic evidence in resolving disputed proxy votes. *See Preston v. Allison,* Del. Supr., 650 A.2d 646, 648 (1994) (citing *Williams v. Sterling Oil of Ok., Inc.,* Del. Supr., 273 A.2d 264, 265 (1971)). "This rule is dictated by the necessity for practical and certain procedures in the fair handling of proxies and the expeditious conclusion of corporate elections." *Williams, supra,* at 265. The same rationale supports the rule prohibiting subjective enquiry to determine the intent of the beneficial owner of shares. *See Blasius Indus., Inc. v. Atlas Corp.,* Del. Ch., 564 A.2d 651, 668 (1988). While the rule and its applications have usually been applied in the case of conflicting proxies submitted by the same shareholder, the underlying policies apply with equal force in this situation. Thus, "correction of mistake must be limited to corrections that can be made from the face of the proxy itself or from the regular books and records of the corporation. The acceptance and consideration of extrinsic evidence for the purpose, especially when questioned and controverted as here, improperly take the inspectors over the line from the realm of the ministerial to that of the quasi-judicial." *Williams, supra,* at 265–66. Therefore, "only record owners are entitled to vote and if any investor chooses to hold his stock in some fashion other than his own name, he thereby assumes the risk that involving in-

termediaries will entail." *Blasius, supra,* at 668 (citations omitted).

 As extrinsic evidence, neither Elisabeth Massey's proxy nor the Everen statements could be properly considered in determining the validity of the Jaeger proxies. Arguing to the contrary, the Andresen faction relies primarily on *Concord Fin. Group, Inc. v. Tri–State Motor Transit Co.,* Del. Ch., 567 A.2d 1, 8 (1989), parenthetically citing it for the proposition that "documents submitted with proxy (such as envelope) are part of proxy itself." Pls.' Resp. to Pridgen's Mot. for Rearg. at 4 ("Pls.' Opp. to Rearg."). But the holding of *Concord Financial* is not nearly so broad. While the case does carve out an exception to the general rule prohibiting review of extrinsic evidence, it is of no help to plaintiffs here. The only exception made in *Concord Financial* allows reference to the post mark on a proxy envelope in order to resolve conflicting proxies filed on different dates. *Concord Fin., supra,* at 8–9.

In this case the problem is not one of discerning the intent expressed by the proxy, but of identifying the record owner from the face of the proxy. Nor does the rule operate too harshly in this instance, for even if I looked beyond the face of the Jaeger proxies to Elisabeth Massey's individually executed proxy, nothing on the face of that proxy (except the corresponding number of shares) relates it in any way to either of the proxies executed by Mr. Jaeger. Since neither Elisabeth Massey nor Mr. Jaeger was a record owner, and since the number of shares listed on these proxies (18,785) did not numerically correspond to any amount listed in the stock ledger (*see* Master's Report at 11), there was and is no objective basis to connect the Jaeger proxies with the Massey proxy. Accordingly, the Master's conclusion as to the proxy purportedly on behalf of the Elisabeth Massey cannot be accepted to the extent it relied upon the proxy executed by Elisabeth Massey to validate one of the Jaeger proxies.

The Andresen faction next argues the Jaeger proxies are entitled to a presumption of validity. They again cite *Concord Financial;* this time for the proposition a "proxy is *prima facie* authentic where [the] signatory had apparent authority to sign proxy." July

5th Letter at 2 (citing *Concord Fin., supra,* at 17); *see also* Pls.' Opp. to Rearg. at 4 (citing *Standard Power & Light Corp. v. Investment Assocs., Inc.,* Del.Supr., 51 A.2d 572, 580 (1947) ("... whatever reasonably purports to be a proxy of a shareholder entitled to vote at an election is entitled to a *prima facie* presumption of validity.")). The problem with the Andresen faction's reliance on these cases is, again, they miss the critical issue. As noted above, the question in this instance is not whether the papers signed by Mr. Jaeger are proxy statements, or which slate Mr. Jaeger intended to vote for, but whether any indication of the record or beneficial holder of the shares intended to be voted can be gleaned from the face of the proxy.

Finally, the Andresen faction argues the exclusion of the Jaeger proxies, thereby disenfranchising Elisabeth Massey, is contrary to well settled corporation law policy. The Andresen faction directs my attention to the Supreme Court's most recent discussion of this issue, in *Preston, supra.* While factually inapposite, *Preston* describes the competing policy concerns at issue in this case. *See Preston, supra,* at 649.

A stockholders ability to participate in corporate governance through the election of directors is a fundamental part of our corporate law. Thus, there is a general policy against disenfranchisement. [citation omitted] However, corporations require certainty and expedience in the decision-making process in order to operate effectively. As a result, although many investors choose to hold their stock through brokers or depository companies, the corporation generally is entitled to rely on its own stock list and recognize votes or other stockholder action only when initiated by the stockholder of record. [citations omitted] If a beneficial stockholder is disenfranchised because of the record stockholder's failure to follow instructions, no relief is afforded in the usual case.... [T]he beneficial stockholder who chooses to register his shares in the name of a nominee ... takes the risks attendant upon such an arrangement.

*Id.* (internal quotations omitted).

 I note also the facts of this case particularly support adherence to the policy fa-

voring certainty in business records over the general policy of enfranchisement. First, the considerable amount of time before an election was held, should have provided all parties ample time to ensure proxies were in order. Second, in the context of a highly acrimonious and contentious contest for control, it is all the more important to ensure the game is played by the rules. Corporations and inspectors of elections are entitled and indeed must be allowed to rely on the face of the proxy in determining, at a minimum, who owns the shares. *See generally Williams, supra,* at 265 ("functions and powers of inspectors of corporate elections are purely ministerial, not quasi-judicial") (citing *Gow v. Consolidated Coppermines Corp.,* Del. Ch., 165 A. 136 (1933)).

The Pridgen faction argues Mr. Jaeger's signatures are nearly illegible. This is almost beside the point, for even assuming Mr. Jaeger possessed the most polished penmanship, in the absence of any facial indication from which one could determine for whom he was entitled to vote the shares, the shares should not be counted. The signature merely reads "Earl E. Jaeger, V.P." Not even a fax legend indicates of what Mr. Jaeger is a vice president. While account statements from the record holder, Everen Clearing Corporation, were faxed with the proxy, as Mr. Jaeger's name does not appear anywhere on the statement, nothing connects him to Everen. The same rule applies to the clarification letter later submitted by Mr. Jaeger. *See, e.g., Williams, supra,* at 265 (rejecting subsequently submitted explanatory affidavit). Finally, as noted above, the number of shares listed did not correspond to any number listed in the company stock ledger.

I therefore find no basis on which to accept the proxies, and I conclude both proxies signed by Mr. Jaeger ought to have been rejected. All 18,785 shares purportedly voted for the benefit of Elisabeth Massey and included by the Master must be subtracted from the total.

Following the August 15 decision, the Andresen faction had 725,107 shares, and the Pridgen faction 709,130. The subtraction of the 18,785 shares reduces the Andresen faction tally to 706,322. This changes the result of the election to favor the Pridgen faction. However, this enquiry continues because the Andresen faction argues in this event I must consider the Master's rejection of 225,000 shares voted in favor of the Andresen faction by the proxy of International Investors, Inc. Since the objection was raised initially and is continued in the opposition to reargument, I will do so.

### C. The International Investors' Proxy

The Microbyx stock ledger recorded International Investors, Inc. as the owner of 225,000 shares. The mailing address is listed on the ledger as in care of John Andresen. At the March 14 shareholder meeting, Mr. Andresen executed a proxy for International Investors, signing on its behalf. Andresen's authority to execute this proxy was then challenged by the Pridgen faction. The Master's report, after describing the circumstances by which International Investors came to be the record holder of the shares, concluded the documents submitted by Mr. Andresen at the meeting in support of his right to vote the shares were insufficient. Accordingly, the Master disallowed the 225,000 International Investors shares. I disagree.

■ A proxy valid on its face, that is, one bearing no "facial indication that the person executing the proxy was unauthorized" to do so, is "entitled to a presumption of validity." *Parshalle v. Roy,* Del. Ch., 567 A.2d 19, 23 (1989); *Gow, supra,* at 147–48. When the presumption is challenged the issue becomes the signer's authority to sign on behalf of the record holder. *See, e.g., Levin v. M-G-M, Inc.,* Del. Ch., 221 A.2d 499, 503–04 (1966). This returns us to the inquiries made by the Master.

■ The Master looked to two documents Mr. Andresen presented in support of his authority to vote the shares. *See* Master's Report, *supra,* at 8–9. First, he reviewed a proxy executed in favor of Mr. Andresen by the corporate secretary of the apparent beneficial owner of the shares, Swiss American Securities ("SAS") as nominee of Swiss Credit Bank ("SCB"). This proxy, by its terms, expired in 1983, and the Master properly

concluded there was no way to resurrect its authority. The second document presented by Mr. Andresen was a Transfer and Pledge Agreement (the "Agreement") among International Investors, SAS and SCB, dated April 27, 1984. *See* Pls.' Exceptions to Master Kiger's April 22, 1996 Report, at Exh. C. The Agreement indicates the shares were received by SAS/SCB in partial satisfaction of a judgement obtained in New York state court against International Investors, Andresen Investors, Inc., and an entity called "Phase II." The Agreement transfers the shares to International Investors which in turn pledges them as collateral available to satisfy the judgement. Paragraph 1 requires the shares to be delivered to Microbyx for transfer to International Investors on the stock ledger. Paragraph 2 provides "that Pledgor [International Investors] shall have the right to vote upon, or to give any approval or consent in respect of, the Pledged Shares for all purposes not inconsistent with" the Agreement. The final paragraph provides for the Agreement to survive until the judgement is satisfied. The Agreement is signed for International Investors by John Andresen as "Investment Officer/Director."

While we do not know whether the Agreement is still in force (and this seems irrelevant in light of the final paragraph), it indicates Mr. Andresen at least at one point had some significant authority to act for International Investors. If he could bind the company to the Transfer and Pledge Agreement to the satisfaction of SAS and SCB, it certainly seems likely he was entitled to vote the company shares. This is by no means conclusive, but it is in his favor. Since indications are that Mr. Andresen had authority to vote these shares, and since the Pridgen faction. offered nothing tending to show Mr. Andresen lacked the authority to vote the shares, they have failed to overcome the proxy's presumption of validity. I therefore conclude the 225,000 shares should have been included in the tally. No other shares affecting the outcome of this election were raised in objection to the Master's report or this motion. When the International Investors' shares are included, the final result is in favor of the Andresen faction by 931,322 to 709,130.

## D. Number of Directors Elected

The Pridgen faction has also argued the March 14 meeting resulted in the election of both the Andresen faction *and* the Pridgen faction slates. This contention was first advanced during oral argument. I will consider it in the hope, perhaps vain, it will once and for all resolve the legal battle for control of this company.

■ The argument presented in favor of the election of both slates is as follows: "[T]he bylaw continues to provide for no less than three nor no more than fifteen directors. Since only nine persons ran for director, and all nine received votes, [the Pridgen slate was] also elected as directors at the March 14, 1996 meeting." Defs.' Mot. for Rearg. at 4–5. As an initial matter I might note, in light of this long-raging internecine conflict, the suggestion that anyone voting shares in the election for a moment would have considered this to be anything other than a "winner take all" election, strains the bounds of credulity. More practically, however, as presented above, the portion of the bylaw allows the number to be set between 3 and 15. A motion was made during the annual meeting to set the number of directors at 3 or 6. *See* Pls.' Resp. to Exceptions, *supra,* at Exh. C. While I cannot conclusively determine the outcome of this vote from the record, since the Andresen slate had 6 nominees and the Pridgen slate 3, it seems safe to assume, absent any indication to the contrary, the number of directors was and is set by the vote at 6. Additionally, the ballot for the election of directors lists the two factions in two separate columns and is headed: "Vote for no more than 6." Pls.' Resp. to Exceptions, *supra,* at Exh. C. Thus presented, and assuming no one split their votes between the two slates, contrary to instructions, the top 6 vote getters would have been the members of the Andresen slate.

## II. Conclusion

While it may appear, at first glance, the conclusions reached in sections I.B. and I.C. above are contradictory, closer reading re-

veals what I believe to be a distinction with a significant and practically important difference. I reach the unremarkable conclusion shares may not be voted when neither the record holder nor the beneficial holder can be determined on the face of the proxy. Neither election inspectors nor corporate boards should be required to scrutinize additional documents offered in support of proxies when they cannot be presumed valid on their face. To hold otherwise would subvert the proxy process and detract from the business of running the corporation.

This case and this corporation have a long and tortured history. I am understanding of the very real concerns expressed by the Pridgen faction about the future of this corporation. As I noted in the last letter to you, this opinion does not speak to who *should* govern the affairs of Microbyx. Counsel for plaintiffs will present an order consistent with this Opinion.